```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                       SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA        )
                                     )
 4           Plaintiff,              )
                                     ) Case Number: 8:19-cr-0200-TDC
 5           vs.                     )
                                     )
 6   ERIC EOIN MARQUES,              )
                                     )
 7           Defendant.              )

 8
          TRANSCRIPT OF PROCEEDINGS - SENTENCING HEARING
 9         BEFORE THE HONORABLE THEODORE D. CHUANG
                  UNITED STATES DISTRICT JUDGE
10         WEDNESDAY, MAY 12, 2021; 9:00 A.M.
                     GREENBELT, MARYLAND
11
                 A P P E A R A N C E S
12
     FOR THE PLAINTIFF:
13
          OFFICE OF THE UNITED STATES ATTORNEY
14             BY:  THOMAS M. SULLIVAN, ESQUIRE
               6500 CHERRYWOOD LANE, SUITE 200
15             GREENBELT, MARYLAND 20770
               (301) 344-0173
16
          U.S. DEPARTMENT OF JUSTICE
17             BY:  RALPH PARADISO, ESQUIRE
               1301 NEW YORK AVENUE, 11TH FLOOR
18             WASHINGTON, D.C. 20530
               (202) 514-5780
19

20   ALSO PRESENT:  Edwin Encarnacion - U.S. Probation Department

21      ***Proceedings Recorded By Mechanical Stenography***
          Transcript Produced By Computer-Aided Transcription
22   _____

23              MARLENE KERR, RPR, RMR, CRR, FCRR
                  FEDERAL OFFICIAL COURT REPORTER
24             6500 CHERRYWOOD LANE, STE 200
                  GREENBELT, MARYLAND 20770
25                     (301) 344-3499
```

```
 1                  A P P E A R A N C E S
                        (Continued)
 2

 3   FOR THE DEFENDANT:

 4       OFFICE OF THE FEDERAL PUBLIC DEFENDER
              BY:  BRENDAN A. HURSON, ESQUIRE
 5            BY:  MAGGIE GRACE, ESQUIRE
              100 SOUTH CHARLES STREET
 6            TOWER II - 9TH FLOOR
              BALTIMORE, MARYLAND 21201
 7            (410) 962-3962

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2          (Call to Order of the Court.)

3              THE COURTROOM DEPUTY:  All rise.

4      The United States District Court for the District of

5   Maryland is now in session, the Honorable Theodore D. Chuang

6   presiding.

7              THE COURT:  Good morning, everyone.  Please be

8   seated.

9              MR. HURSON:  Good morning, Your Honor.

10             MR. SULLIVAN:  Good morning, Your Honor.

11             THE COURTROOM DEPUTY:  The matter now pending before

12  this Court is criminal number TDC-19-0200, United States of

13  America vs. Eric Eoin Marques.  We're here today for the

14  purpose of a sentencing hearing.

15      Counsel, please identify yourselves for the record.

16             MR. SULLIVAN:  Good morning, Your Honor.  Thomas

17  Sullivan for the United States.  Also at counsel table is Ralph

18  Paradiso, trial attorney with the Child Exploitation and

19  Obscenity Section.  Good morning.

20             THE COURT:  Good morning.

21             MR. HURSON:  And good morning, Your Honor.  Brendan

22  Hurson and Maggie Grace from the Office of the Public Defender

23  in Baltimore on behalf of Mr. Marques who is seated to the

24  right of Ms. Grace.

25             THE COURT:  Okay.  Good morning.

1          MS. GRACE:  Good morning.

2          MR. HURSON:  Good morning.

3          THE COURT:  Good morning to Mr. Marques.

4          THE DEFENDANT:  Good morning.

5          THE COURT:  So we're here for sentencing in United

6   States vs. Marques.  On February 6, 2020 -- or was it 2021 --

7   Mr. Marques pleaded guilty to conspiracy to advertise child

8   pornography in violation of 18 U.S.C. Section 2251(d)(1)(A) and

9   (E).  I received the following documents in connection with

10  today's proceeding:  First, the revised presentence report, ECF

11  66; the defendant's sentencing memorandum with attachments, ECF

12  72; the Government's sentencing memorandum with attachments,

13  ECF 78; the Victim Impact Statements, ECF 76; the motions to

14  strike, which are at ECF 82 and 83; and the Government's

15  response, which is ECF 86; the Motion for an Order of

16  Forfeiture, which is ECF 87.  There was also a notice of

17  witness testimony, which I understand has been withdrawn.

18       Is there anything else I should have received by now?

19          MR. SULLIVAN:  Your Honor, the Government submitted a

20  prior forfeiture motion under ECF 75.  That's superseded by 87.

21          THE COURT:  Okay.  Thank you.

22       Anything from the defense that I've missed?

23          MR. HURSON:  I don't believe -- I have the earlier

24  forfeiture at ECF 70, but I think that was the money, and then

25  the money and the items are in the new order.  So I think we're

1   on the same page.

2           THE COURT:  Okay.

3           MR. SULLIVAN:  Just to be clear, Your Honor, the

4   items were included in the prior forfeiture based on the

5   consent.  We have removed four of the items and that's the

6   reason for the amended forfeiture order.

7           THE COURT:  So there is no reason to address the

8   earlier one, correct?

9           MR. SULLIVAN:  That is correct, Your Honor.

10          THE COURT:  Okay.

11      So let me begin by addressing some of these motions that

12  were filed.  First, the Motion to Strike the Notice of Witness

13  Testimony at ECF 83, I understand from the written filing the

14  Government is now withdrawing that witness.  So the motion is

15  now moot.  Is that correct?

16          MR. SULLIVAN:  That is correct, Your Honor.

17          THE COURT:  Okay.  So that motion at ECF 83 will be

18  denied as moot.

19      Then there is the Motion to Strike the Government's

20  Sentencing Memorandum, ECF 82, as untimely.  I think everyone

21  agrees the memorandum was filed I believe on May 5th, which was

22  a week late.  There was no motion for leave to file it late or

23  explanation for filing it late.  It was over 40 pages.  So it

24  was not an innocuous, easy-to-digest document.  So the defense,

25  in their motion, has identified a potential prejudice from the

1   late filing.

2       Mr. Sullivan, I know you said in your written filing that

3   this was just a scheduling error.  It did occur to me that

4   perhaps with Ms. O'Malley no longer here that perhaps the ball

5   was dropped in the middle, but I looked and both you and

6   Mr. Paradiso have been on this case for two years.  So maybe

7   you can clarify what the explanation is.

8           MR. SULLIVAN:  Sure, Your Honor.  Again, the

9   Government is not excusing the late filing.  Had we at the time

10  thought it was late, we would have submitted a motion to file

11  it out of time.  The Government -- I can only apologize.  We

12  were under the -- at least I was looking at it as filing a

13  response typically a week after the defense counsel motion.

14  The Government, in having it re-calendered, did not re-calendar

15  the actual sentencing motion in our calendar.  So it's late.

16  The Government does not have an explanation other than it was

17  my mistake.

18          THE COURT:  So your position -- because I know you

19  also filed this notice -- motion to file the late restitution

20  order or memo.  So you understood the restitution was due two

21  weeks before you filed the motion saying "could we file this a

22  little bit late," and you're saying that your view was that you

23  weren't intending to file a sentencing memorandum but that once

24  you saw the defense, you thought you had seven days to do that?

25          MR. SULLIVAN:  No, Your Honor.  Typically -- and,

1  again, this is not an excuse; it's an explanation.  Typically

2  in the sentencing orders, the Government -- there is a

3  sentencing memorandum deadline and then there is a responsive

4  sentencing deadline.

5          THE COURT:  I mean, I've used the same sentencing

6  order for years now.  It always says the same thing, 14 days.

7          MR. SULLIVAN:  Your Honor, I'm not -- I'm just

8  explaining -- I'm not trying to excuse it.  I'm just advising

9  the Court that I apologize for the late filing, and the Court

10  should take whatever action it feels appropriate.

11          THE COURT:  Okay.

12      So, Mr. Hurson, you filed the motion to strike this, and

13  you also say, in the alternative, to accept the -- effectively

14  the reply that you've included in that document.  Can you

15  explain what the -- I mean, Mr. Sullivan has acknowledged this

16  was late filed.  You did have a period to respond to it.  Is

17  there prejudice to your client that's not curable?

18          MR. HURSON:  Well, that's a tough question to answer

19  in this sense.  In the ordinary course, it is difficult to

20  prepare for sentencing.  It is extra difficult when you're

21  talking about this pandemic and some of the communication

22  difficulties that have been put in place because of it; meaning

23  that we cannot just run over to the jail, bring the filing, and

24  walk through it with Mr. Marques.  Add to that that we also had

25  scheduled our lives around the Court's scheduling order, which

1   is as much for the Court as it is for us.

2       To specifically answer your question, we have done our

3   best to go through the Government's arguments with Mr. Marques,

4   to discuss them with Mr. Marques, to go back to the discovery

5   and try to match up some of what he said and come in today

6   prepared to address what the Government wrote.  So I can't say

7   we have not had the opportunity to at least make an effort to

8   respond, but as you saw in our response, there were a number of

9   just what we consider to be outright factual misstatements

10  that, unfortunately, took a lot of time to cure and a lot of

11  time to go to back through.

12      And there was also a request to do something that we

13  thought was completely out of left field and that was very

14  significant, and so we discussed that with Mr. Marques.

15      So I apologize for rambling on, except to say that we've

16  done our best to cure the prejudice by talking with him about

17  what they filed and preparing today to respond to it.  So I can

18  say that we have done everything we can to respond to it, and I

19  think we will be able to effectively do that today.

20          THE COURT:  Okay.  Perhaps I can ask a question both

21  sides can answer.  Mr. Sullivan mentioned the schedule in the

22  sentencing order.  As I said, my scheduling sentencing order

23  has been the same for years.  Everything is 14 days before in

24  part because everyone basically decided that everything they

25  file was going to be responsive, and so there was no need for

1   seven days.

2       But can someone -- can both sides, since you're both

3   repeat players in the court, ideally focusing on the Greenbelt

4   judges, is it correct to say that other judges do it

5   differently in this division; that they all allow for the

6   seven-day response so that the confusion could be based on

7   which session you're in?

8           MR. HURSON:  I'm not familiar with what they do,

9   honestly.

10          MR. SULLIVAN:  Your Honor, my experience in other

11  judges, Judge Hazel, Judge Grimm, Judge Chasanow -- I have not

12  had as many cases with Judge Xinis.  I believe she may have the

13  same practice where it's opening sentencing and then it's a

14  response so that way the parties have an opportunity to join

15  the issue, or at least the Court has an opportunity to get both

16  perspectives instead of having them both filed at the same

17  time, which could potentially not address --

18          THE COURT:  I'm sorry.  You're saying the ones that

19  you do have experience with, Judge Hazel, Judge Grimm, Judge

20  Chasanow, what is their practice?

21          MR. SULLIVAN:  It would be the initial sentencing

22  memo at some period of time, typically 14 days, and then the

23  response, if any, would be seven days.  And, again, it's the

24  same qualifications as this Court has.  If you're asking for a

25  sentence above or outside of the guidelines, you may file a

1  sentencing memo.  Responsive memos would be due seven days

2  after the initial filing, which is typically, in my experience

3  with those judges, seven days before sentencing.

4          THE COURT:  Okay.

5      Mr. Hurson, do you agree with that?

6          MR. HURSON:  I do.

7      I wanted to say one thing about the whole scheduling

8  issue, if I may.  One, to answer the Court's question directly,

9  it is almost the uniform practice in the District of Maryland

10 that sentencing memos are due two weeks prior to sentencing.

11 There are a few judges who will say, well, look, if it's a

12 little bit after that, I'm okay with it.

13     But your standard order appears to encapsulate the

14 practice that is in play not just here in Greenbelt but also in

15 Baltimore, which is two weeks prior, and if a side wants to

16 respond, then they have to do so within seven days.

17     The Government clearly is aware of this -- and this is a

18 little bit awkward, but I'll say when they filed their notice

19 of witness testimony, they explicitly referenced the Court's

20 scheduling order and said this has to be in two weeks prior.

21 And just a paragraph or two after that -- or before that -- I

22 don't have it open in front of me -- it says the rule on

23 sentencing memorandum.

24     And what the Government did file was not a response.  A

25 portion of it, I would say, when they responded to the argument

1   with respect to Asperger's Syndrome and Autism Spectrum

2   Disorder, I will credit that that is arguably a response even

3   though that information was included in the presentence report;

4   but the vast majority of the Government's filing was not a

5   response, and, in fact, the motion was titled a motion in

6   aid -- a memorandum in aid of -- I think it had a typo -- of

7   sentencing, but it was trying to say motion -- a memorandum in

8   aid of sentencing.  It was not a response.

9        And, look, I make mistakes.  I'm not going to say all the

10  time, but I certainly make mistakes, but one thing that

11  Ms. Grace and I have tried to do throughout this process is

12  adhere to the Court's deadlines; and, in fact, the Court may

13  recall that the deadline for motions, we had asked for an

14  extension in that deadline because we had a ton of discovery.

15  There was more coming.  And, unfortunately, the Court was not

16  able to grant that until after the deadline.  So what did

17  Ms. Grace and I do?  We stayed in our office until 11:59 and

18  filed our motions on the day that it was due.

19       And that was I think -- I hate to say I'm maybe just a

20  little bit bothered by the idea that one side, meaning the

21  Public Defender's Office, is diligently working to meet these

22  deadlines and then the Government doesn't, and this happens

23  frequently.  And I understand mistakes do happen, but at some

24  point it seems to feel like a level of entitlement, and that

25  was our problem and that's why we filed the motion to strike,

1  because we don't normally do that.

2          THE COURT:  Well, okay, so --

3          MR. HURSON:  But, again, I'm editorializing and I --

4          THE COURT:  No, no.  I mean, honestly, I share your

5  frustration, Mr. Hurson.  I don't think that the deadlines are

6  typically followed.  I do think that -- I would suspect both

7  sides, as well as CJA counsel and retained counsel, take the

8  sentencing order and just don't even read it.  I'm most amazed

9  -- and, you know, one of the pieces of advice I give my law

10  clerks is just read everything the Court issues because it's

11  clear that counsel doesn't always do that.  I'm not saying

12  present company but just in general.  And so I am frustrated

13  that the deadlines are not always followed.

14          I also, in looking at the order again, I make it very

15  clear that there is no responsive sentencing memo, and the

16  reason, again, I took that out is because everyone was just

17  calling everything they did responsive and nobody actually

18  cared about the 14 days.  So the only thing you can respond to

19  is responding to a motion of some kind, which is different.

20          And so I think it is erroneous to read this, even though

21  other judges may do it this say, as saying there is an

22  opportunity to respond to the sentencing memo.  I think if you

23  really want to file a response, you either ask for leave to do

24  so or you just do it orally at the hearing or what have you.

25          But I think -- two things.  One is that I do accept

1   Mr. Sullivan's point that this is a good-faith mistake.  I

2   think he has over the years shown that he doesn't willfully

3   violate the Court's orders.  I mean, I think it's just curious

4   in a case of this magnitude that seems to have international

5   implications that none of these deadlines seem to have been

6   followed, not just that one but the one about the witness

7   filing and the one about restitution, et cetera.  But I accept

8   their representation.

9        Secondly, I think just historically and in recent history,

10  both offices have this issue.  I'm frequently frustrated by the

11  Federal Defender, not present company but members of your

12  office, missing these deadlines, including, in particular,

13  filing things on the morning of or the eve of sentencing when

14  it is very clear that if you're going to submit letters and so

15  forth, it's got to be seven days; otherwise, I don't have time

16  to read these things.  And I know that you're somewhat beholden

17  to family members and otherwise, but you can also make it very

18  clear to them what the deadlines are, and your office, you

19  know, repeatedly fails to do that.

20       So given that both sides typically do that and given the

21  significance of the issues in this case and the fact that the

22  Government -- the defense has had an opportunity of sorts to

23  respond, I'm not going to strike the memorandum, but -- so I

24  will deny the motion to strike.  I will grant the part that

25  asks for the opportunity to respond in writing, which is the

1   defendant's submission, which I have read and considered.

2       But I am -- this is another opportunity for me to

3   communicate with Mr. Wyda and Mr. Lenzner that going forward,

4   we're just going to follow these deadlines strictly.  We're not

5   going to need motions to strike.  I'll just strike sua sponte

6   things that are late filed, particularly if they don't have an

7   excuse or a reason that's offered, which, of course, is always

8   an option that counsel can provide.  I know that they are busy

9   and that either mistakes are made or there is an extenuating

10  circumstances.  So that's how I'll handle that issue.

11      But, again, I share the defense's frustration, but I think

12  given where we are in this case, it's not appropriate to strike

13  it.  I will try to make the policy more clear with both offices

14  so that not just all of us here but everyone else in the

15  criminal process tries to follow that procedure.

16      Mr. Sullivan.

17          MR. SULLIVAN:  Just to be clear, Your Honor, the

18  Government did not read the seven-day rule as an invitation to

19  file responsive memos.

20          THE COURT:  No, I understand that.  I'm just saying

21  that that's been --

22          MR. SULLIVAN:  I didn't want the Court to think --

23          THE COURT:  That's the reason why we don't have that

24  rule anymore.

25      Okay.  So then I think there has been some informal

1   communications about the motion for post restitution sentencing

2   hearing, which is ECF 74.  I don't know if there is a formal

3   ruling on the late filed brief and on the hearing.  On the late

4   file brief, I will grant that motion.  I think it's unopposed.

5       On the hearing, we're getting into the same question as we

6   said earlier.  I understand the defense's frustration.  I think

7   the memorandum -- striking the memorandum was a more -- if

8   there was something I was going to do, that's what I would have

9   done.  I don't think I'm going to -- I'm not going to deny the

10  post sentencing restitution hearing.  I will grant the motion

11  for that.

12      And even though I believe it's the case that, based on

13  what was submitted, that the Government again for some reason

14  missed the time -- I mean, had time to some degree to try to

15  process this but failed to do so, but I'm not going to penalize

16  the victims for that.  I think this is a different category.

17  Whether it's the Victim Impact Statements, which also were to

18  some degree filed late, but I guess those might not have fallen

19  into that category, but certainly when victims submit their

20  impact statements or seek restitution, I'm not going to

21  penalize them for counsel's issues, and so I will allow that

22  hearing.

23      It seemed as if from what was filed that the parties have

24  reached agreements on much of the restitution.  So if there is

25  a way to reach an agreement on this remaining part that does

1  not require a hearing, that would be fine; but if there is a

2  need for a hearing, we can have one.  I don't have a date yet.

3  I think our chambers has mentioned to you there's a lot of

4  challenges with June, but we will get it in, and we'll work on

5  a date for that.  So that motion at ECF 74 will be granted.

6        Okay.  So now let's move on to the sentencing itself.

7  Mr. Hurson, Ms. Grace, have you and your client had the

8  opportunity to read and review the presentence report?  And do

9  you have any remaining objections to it?

10       MR. HURSON:  We have, Your Honor.  We have read it,

11  and we have no remaining objections.

12       I would note one thing that jumped out at me that I don't

13  know how either side missed, but on page 2, as to release

14  status, it says the defendant was initially arrested on

15  July 29, 2019.  That should have said 2013.  But beyond that, I

16  think we've covered everything else.

17       THE COURT:  Okay.  Mr. Encarnacion, can you make that

18  correction?  I think that sounds like that's correct.  The

19  correction is correct.

20       MR. HURSON:  I think there's a few things in the PSR

21  that will be discussed during the arguments as to what the

22  significance of or what they meant, specifically the $30,000 a

23  year that was supposedly said to Pretrial, but our position on

24  that has been we weren't there.  That's what they recorded.

25  And we can discuss what that meant and the significance of that

1  without necessarily striking that if that's okay with Your

2  Honor because, again, if we were going to move to strike it and

3  the Government opposed, I think we may have to have a witness.

4          THE COURT:  Correct.

5          MR. HURSON:  And I think we can explain it and get

6  our point across to the Court.

7          THE COURT:  Okay.

8      So, I mean, I think the original report had a different

9  method of calculation.  The parties then proposed the method

10 that's in the plea agreement, and I think everyone has now

11 accepted that.  Is that right, Mr. Encarnacion?  Do you agree

12 with that approach?

13         MR. ENCARNACION:  Yes, Your Honor.

14         THE COURT:  Okay.

15     So am I correct, though, that using -- I believe it's --

16 as I understand it, the parties are proposing that we use 2G2.2

17 or 2.2 -- as opposed to -- I'm sorry.  2G2.1, as opposed to

18 2G2.2.  Correct?

19         MR. SULLIVAN:  That's correct.

20         THE COURT:  And the hook here seems to be not just

21 the fact that there was this server and there was some

22 advertising or promotion of child pornography but that there

23 was actually a solicitation or a requirement that certain new

24 child pornography be produced in order to gain access to the

25 site, and that's the reason why we're looking at 2G2.1.  Is

1  that accurate?

2       MR. SULLIVAN:  Your Honor, yes.

3       Just briefly, with respect to looking at 2G2.2, the

4  Government relied on the cross reference at subsection (c)(1),

5  which says if the offense involved causing, transporting,

6  permitting, or offering, or seeking by notice of advertisement

7  a minor to engage in sexually explicit conduct, apply 2G2.1.

8            THE COURT:  Right.  But it's not simply that they

9  were soliciting child pornography to be submitted, but they

10  were soliciting the actual production of new pornography.

11  Correct?

12           MR. SULLIVAN:  Yes, that is the reason why.

13           THE COURT:  Okay.  And the parties are agreeing that

14  that's the appropriate guideline.  Correct, Mr. Hurson?

15           MR. HURSON:  Yeah, we're agreeing that's the

16  appropriate guideline.  I don't know that we necessarily come

17  to the same place for the same reasons, but we certainly agree

18  that's the appropriate guideline.

19           THE COURT:  Okay.  So I do find based on that nexus

20  that Mr. Sullivan referenced, particularly the apparent

21  requirement for the server, that there be some submission of

22  new child pornography in order to gain access to at least one

23  part of it, that we can apply 2G2.1.  So the total offense

24  level is 41.  The criminal history category is 1.  So the

25  guideline range would be 324 to 405 months, but because of the

1  30-year maximum penalty, the guideline range is effectively 324

2  to 360.  The guideline range for supervised release includes a

3  mandatory minimum of five years and a maximum of life, and the

4  guideline range for a fine is 25,000 to $250,000 based on the

5  older guidelines, and the special assessment is $100.

6       Any issues with any of those numbers?

7            MR. SULLIVAN:  Not from the Government.

8            MR. HURSON:  Not from the defense.  Thank you.

9            THE COURT:  Okay.

10      So we can move to argument on the sentence, and I

11  typically will hear from the Government first and then from the

12  defense and then, if you would like to, Mr. Marques.  I believe

13  that in addition to generally where -- I'm assuming the parties

14  will recommend sentences within the 11(c)(1)(C) plea range, but

15  in addition to explaining why that range is appropriate and the

16  particular number you're recommending is appropriate, perhaps

17  we can also discuss this other issue which has come up in the

18  papers about the Government's request for some kind of language

19  in the judgment effectively recommending that he not -- that

20  Mr. Marques not receive credit for the six years in Irish

21  custody.  We can talk about that as well.

22      So why don't we begin with Mr. Sullivan or Mr. Paradiso.

23            MR. PARADISO:  May I begin, Your Honor?

24            THE COURT:  Yes, go ahead.

25            MR. PARADISO:  Can you hear me?

1          THE COURT:  Yes.

2          MR. PARADISO:  Thank you.

3      The pedophile is given a documented time frame of

4  punishment to serve due to its crimes.  The victim is given a

5  lifetime of punishment to serve not due to her own fault but

6  due to the heinous actions of the pedophile.  These are the

7  words of one of the defendant's victims, one of the many

8  children whose rape and sexual abuse were recorded and shared

9  on over 200 websites located on the defendant's servers, one of

10  the 8.5 million images of child sexual abuse material that were

11  recovered from his server.  1.97 million images had never been

12  seen by law enforcement before.

13      He was the largest facilitator of child pornography

14  websites on the planet when he was arrested in 2013.  The

15  extent of his crime and the harm that he has caused to children

16  is unprecedented and without equal.

17      The Government agrees with the defense when they said in

18  their memorandum that he deserves punishment directly related

19  to his crimes and his culpability, but there is no one else

20  like the defendant in the world.  No one else has committed

21  crimes like the defendant in the world.  Only a 252-month

22  sentence that takes into account his time that he's spent in

23  Irish prison and a lifetime of supervision is needed for this

24  defendant.

25          THE COURT:  What do you mean by "takes into account

1   his time in the Irish prison"?  Because the plea agreement uses

2   that type of language and, frankly, that's kind of vague.  I

3   don't know what that means, to take into account.  I mean, does

4   it mean that we're assuming that it's going to count or we're

5   assuming it's not going to count and, either way, we've thought

6   about it and here is our proposed sentence?  Where in that plea

7   agreement or anywhere else is there language that establishes

8   that everyone agreed that time was going to count or not count?

9           MR. PARADISO:  Yes, Your Honor.

10      So when we came up with the sentencing range, as Your

11  Honor knows, the sentencing range is higher.  When you add in

12  the approximately five and a half to six years he spent in

13  Irish prison, on top of the 252 months, that comes close to the

14  bottom of the range of his guideline sentence, and that's where

15  we got the number and that's why that was taken into account

16  when we agreed --

17          THE COURT:  Again, what does it mean to take into

18  account?  Someone could just as easy look at that and say,

19  well, everyone assumed under the law that's going to be

20  accounted for, that he's going to get a credit for that, and

21  that's why we're setting this range where it is, as opposed to

22  setting it at some other number.

23      I guess I'm trying to understand -- well, I mean, I don't

24  know if you're still arguing what was in the papers, but if

25  you're arguing for some sort of mechanism to ensure that he

1  does not get credit for those six years, the first step, which

2  I'm not even sure is enough, is to show that that's what

3  everyone agreed on, and I guess I'm not seeing where the

4  language says that's what the agreement was.

5          MR. PARADISO:  It's the Government's position that

6  that's what the language does show, Your Honor.

7          THE COURT:  So why doesn't it say the guidelines are

8  what they are, and the parties are agreeing on a six-year

9  downward departure under 5K2.23 or 5G1.3 because this time is

10  not going to be accounted for?  Why doesn't it say something

11  like that?  I've actually seen that in a recent agreement in a

12  different type of case, something like that.

13          MR. PARADISO:  Yes, Your Honor.

14      All I can say is that it was just inartfully crafted in

15  the wording of the language, but that's what we had put in and

16  that's what was agreed upon when we came up with this guideline

17  range and came down from where the defendant would have been in

18  his normal guideline range.

19          THE COURT:  Okay.  Well, why don't we keep going and

20  then we'll get back to that issue.

21          MR. PARADISO:  So looking at the 3553 factors in this

22  case, a sentence of 252 months is not greater than necessary to

23  accomplish the goals in this case.  The nature of the

24  defendant's crimes are unparalleled.  He was the largest

25  purveyor of child pornography in the world.  From the period of

1  time that he is charged, from 2008 to 2013 when he was

2  arrested, he was running a Freedom Hosting web host service on

3  the Tor network, which allowed him and all the other

4  co-conspirators anonymity from law enforcement and others.

5  Additionally, he encrypted those websites and that server so

6  that law enforcement would have difficulty finding it and

7  accessing it.

8       The defendant didn't just distribute or advertise child

9  pornography.  He created a meeting place for all others just

10 like him who were interested in child sexual abuse material to

11 gather, get together, and share their accomplice of rape and

12 sexual abuse of children and to discuss that with each other.

13      These websites involved some of the most heinous crimes

14 against children.  One called Hurt to the Core was dedicated to

15 the violent sexual abuse of children.  Another called Hoarder's

16 Hell required users to actually produce new child pornography

17 to gain access to the website, and it outlines specific ways

18 you had to show that it was new by placing a candle with the

19 child, by putting the child in different poses, all things to

20 show that you were actively producing child pornography.

21      This website was found in the three gigabytes of data that

22 was -- the FBI was able to recover from the defendant's laptop

23 when he was arrested.  We were not able to access 21 gigabytes

24 of data on that computer because he encrypted it.  So we do not

25 know the full extent of the defendant's crimes.  All we have is

1  that tiny sliver, that three gigabytes that we can see.

2       And when he was arrested, when the agents did go into his

3  home that day, he tried to stop them from accessing that three

4  gigabytes of data.  They had to stop him before he could lock

5  up that computer.

6       When he was released after his detention hearing, he still

7  tried to protect himself and his co-conspirators.  He went out

8  and purchased a new computer, logged into his servers, and

9  locked the FBI out.  Fortunately, they were able to get back

10  in, but he did all of this to protect himself and the others

11  because he knew what he was doing was illegal and wrong.

12       In the sentencing memorandum, the defendant avers that he

13  did not physically touch any children, but that has no issue to

14  the crime that we're dealing with here.  That's like saying I

15  should be given credit if I rob a bank because I didn't shoot

16  anybody.  That's not what we do when we sentence.  We sentence

17  you for the crime that you've committed, and in this case, the

18  defendant advertised and distributed child pornography, not

19  just in the United States but around the world.

20       He created a system to hide.  He lived in Ireland.  He had

21  his server in France.  He had a Dropbox to receive money and

22  payments in the United States, and then he had his own child

23  pornography website, the Onion Pedo Video Archives, located on

24  another server that was in the Netherlands.  He did all of this

25  so that he could enjoy his interest of child sexual abuse

1    material.

2        But remember, Your Honor, we were only able to access that

3    three gigabytes of information.  So we don't know the full

4    extent of his crimes, but his use of this server, his running a

5    child pornography website makes him no less culpable to the

6    harm to these children than what was caused by those who abused

7    them.

8        Though these children's abusers may have actually

9    physically touched them and sexually abused them, it's people

10   like the defendant who abuse them over and over and over again

11   each time that video is shared, each time that video is

12   accessed, and each time that video is viewed.  As his victims

13   have said, "My abuser stole my childhood, and each defendant

14   who possessed and distributed pictures abuse and steal my life.

15   Each defendant keeps the cycle going by keeping the pictures

16   circulating.  I do not think I will ever fully heal until these

17   graphic pictures are removed from the Internet, but,

18   unfortunately, nothing ever comes off the Internet."

19       The defendant averred in his sentencing memo that all he

20   did was provide a web hosting service, and he didn't know

21   everything that was going on in that server.  That's not true.

22   He did way more than that.  In that tiny sliver of information,

23   that three gigabytes that we could access, we saw that he went

24   to a number of different websites on that server.  We saw that

25   he went to Lolita City, which is a child pornography website,

1   over 400 times.  We saw that he went to Hoarder's Hell, which

2   required active production of child pornography, and the Love

3   Zone, which were two restricted websites.  You couldn't just

4   access them.  You had to be permitted into them.

5        He also ran OPVA, or the Onion Pedo Video Archives, which

6   was a child pornography website, and we saw he went there over

7   1,500 times.  On that website that he was the administrator of,

8   the categories were for toddlers and pre-teens, and many of the

9   images that were found, that were found on his computer

10  involved sexual exploitation of children, to include infants.

11       From that tiny sliver of information, that three gigabytes

12  of information, we saw he was actively involved in the child

13  sexual abuse community.  So he was not simply the website

14  administrator or a host of a server.  He was an active member

15  of this community.  He was a person who created the meeting

16  place for all other members to come, and he created the place

17  for them to put their websites.

18       But let's look at his history and the character of the

19  defendant.  He came from a stable home.  He had supportive

20  parents.  Many times over his life they thought there was

21  something wrong with him, and at least, according to the

22  defense sentencing memo, on at least four different occasions

23  he saw a mental health expert to see what was wrong; and it was

24  only until 2014, after he had been arrested, that he was

25  diagnosed with Asperger's.

1        Now, under the DSM-5, Asperger's is no longer an actual

2   condition.  It falls under the Autism Spectrum Disease.  Autism

3   is a unique disease because it's not just one category.  There

4   is a low end and a high end.  Those that are on the low end

5   have harder time functioning in society.  Those on the high

6   end, like the defendant, can function a little bit easier in

7   society.  They have some limitations.

8        For instance, for the defendant, as you can see from the

9   doctor's reports, he has issues with social interactions.  He

10  has issues with types of foods he may like, and he has issues

11  not being able to basically take social cues.  All of those do

12  not in any way suggest why he would have an interest in

13  children.  None of that does.  All it says is when he's with a

14  group of people, he just doesn't know how to react.

15       Recently we learned Elon Musk has the same syndrome as the

16  defendant.  We have no indication that Elon Musk is doing any

17  of this stuff.  Having a relative who has the same disease as

18  the defendant, the same diagnosis, it is difficult to say that

19  -- why the defendant would do this.

20       Social interactions are not the same as committing a

21  crime.  He knew the difference between right and wrong.  He

22  knew what he was doing was illegal.  That is why he did it on

23  Tor, so that he could be protected.  That is why he encrypted

24  his servers.  That is why he tried to stop the agents when they

25  came to his house, and that is why, when he was released, he

1   immediately went to a store and bought a computer to lock them

2   out.  He knew it was wrong and he knew it was illegal.

3       Additionally, one of the aspects of the disease is an

4   obsession, as the defense has pointed out multiple times in

5   their memo.  The defendant's obsession here is child

6   pornography.  That is not going to go away.  Nothing in their

7   expert's recommendations to help him get better deals with

8   that.  It deals with helping him with social interactions,

9   helping him cope in situations.  Nothing in there talks about

10  dealing with his child sex abuse obsession.  Nothing.  That is

11  something that's not going to go away.

12      When you look at the seriousness of the crime that the

13  defendant has, conspiracy is worse than others because you're

14  getting together a group of like-minded individuals to get

15  together to commit a crime, and it's more likely that a crime

16  will occur.

17      Here they all got together to sexually abuse children or

18  to share that sexual abuse of children.  The websites, some of

19  them, require that you produce that child pornography, which

20  means that the defendant was helping create the market place

21  for this material.  Websites on his server require that they

22  produce -- new material be produced so you can access it and

23  new material be produced so you can continue to access it.

24      1.97 million images had never been seen by law enforcement

25  before.  Those are all new images all on the defendant's

1  server, all in the market place he created.

2      And the defendant has admitted that he's been successful

3  in this business.  He told that to the Irish court, which was

4  part of the Government's exhibits, and he told the Pretrial

5  Services he made about $30,000 a month.  But we don't have to

6  just take his word.  As you can see from that exhibit, the FBI

7  agent who testified said they were able to look at two of his

8  U.S. accounts, and over a six-year period, from 2006 to 2013,

9  one account had over $941,000 in it; another account had over

10 $1.5 million in it.  When you break that down monthly over that

11 time period, that comes out to roughly $33,000, which

12 corresponds closely to what the defendant said he made.  So he

13 was very successful in his business.

14     And let's not mistake from what he told us or told

15 Probation and Pretrial Services, he's had no other job, no

16 other job since he was 17 years old, which was approximately

17 2003, 2002.  This is the only work he knows is running these

18 websites.  He is a danger to the community and the world

19 at-large.

20     The defendant's crime has gone unprecedented, Your Honor.

21 These websites require people to produce child pornography, and

22 they shared it throughout the world; but we only know that tiny

23 sliver of what he did, but we also know that he just wasn't

24 hosting.  He was viewing and actively engaging in the website,

25 the child pornography website of his own.

1        When we look at the deterrence here, only a 252-month

2    sentence will deter him and others like him for the seriousness

3    of his crime.  As I stated, there is no other defendant like

4    the defendant.  There is no other person who has committed a

5    crime like him.  When looking back at other sentences of other

6    child pornography users, distributors, possessors in this

7    courthouse, there has never been anyone like him.  Given where

8    I work in the Child Exploitation Section, we have not seen

9    anyone like him before.  His crimes are unparalleled.

10        And we disagree with the defense's argument in their memo

11    where they say there is no meaningful difference between a

12    deterrence of 15 years and 21 years.  There is.  Six years is a

13    deterrence.  It's a longer time.  It keeps this defendant off

14    the streets.  It keeps him away from a computer again, and it

15    protects the children who he harms so he cannot share and then

16    hide from his crimes again.

17        Do not forget that in his hearing in Ireland, they found

18    evidence he was trying to go to countries that don't have

19    extradition with the U.S.; Russia, where he can go and commit

20    this crime again where the United States would not be able to

21    find him.  There is a deterrence effect for him to maybe stop

22    him from doing this again and a deterrence to others so that

23    when they see that someone is getting a very lengthy sentence,

24    that they may not do this in the future.

25        The sentence imposed in this case has to reflect the pain

1   and suffering that he's caused these children and the

2   reinjuring of them each time he's sharing something.  And don't

3   forget, Your Honor, he has the ability to commit this anywhere

4   in the world.  He was in Ireland committing crimes in the

5   United States.  His co-conspirators are world-wide.

6       The defense also asks us to look at the disparity of

7   sentencing, saying that in Ireland he would have gotten a

8   certain sentence, or here are the mean sentence -- or the

9   median sentences were 11 years for other persons.  But we don't

10  look at other sentences around the world because different

11  countries have different laws, and the mean and median sentence

12  here of 11 years is dealing with possession cases, not somebody

13  like the defendant, not somebody who goes to 200 websites with

14  eight and a half million images in his own child pornography

15  website.  There is no mean and median for the defendant.  He

16  stands alone.

17      This defendant victimized children over and over again

18  each time he allowed one of those websites on his server, each

19  time he went to one of his own websites, and each time he

20  viewed and accessed child pornography.

21      We are asking you for a 252-month sentence with a lifetime

22  of supervision.  That takes into account or does not give him

23  credit for the time that he received in Irish prison.  We ask

24  that you put that in his JNC so that BOP does not give him that

25  credit.  That will show the seriousness of the crime.  It will

1   deter others and will hopefully deter this defendant and

2   protect his victims and other children like them.

3          THE COURT:  So let's get back to that issue.  The

4   defense says in their briefing that their understanding of the

5   negotiations -- and you already mentioned your view of it --

6   was that -- you're saying the reason why the Government agreed

7   to 252 was the assumption that those six years would not be

8   counted, and yet in your briefing it seems like you're saying

9   that, at least based on these unpublished Fourth Circuit cases,

10  that it would be counted, and that that was either a mistake or

11  what have you, and now you're trying to get the same result

12  even though your understanding of the law may be different than

13  it was at the time.

14      Is that accurate or is there a different way of looking at

15  it?

16          MR. PARADISO:  So I don't recall us saying that

17  legally you couldn't -- that it was illegal.  I apologize.  I

18  don't remember those words being said.  I thought it was --

19  what we were saying was that, you know, it's already been taken

20  into account in the agreement that the parties came to.

21          THE COURT:  Well, I guess, you know, in your

22  sentencing memorandum, which is, as we've noted, is part of the

23  record now, I mean, you basically say, look, it's likely --

24  maybe I don't know if we can say it's an absolute certainty,

25  but it's likely that this time will be counted based on *Major*

1   *vs. Edgar* and other cases that you cited.  And so what you're

2   asking me to do -- first off, it doesn't sound like you're

3   asking me to sort of order that this time be counted.  I think

4   everyone seems to agree that under 3585, I can't do that.  Is

5   that correct?

6           MR. PARADISO:  Yes, Your Honor.

7           THE COURT:  But you are asking for a recommendation

8   on whether it should be counted, and I think it is true that

9   the courts and I have made recommendations in the past, usually

10  in a straightforward situation where someone has spent time in

11  state custody on the same set of facts and it comes over to the

12  federal side, and even though BOP will probably figure out that

13  that time will count, assuming that we understand it not to

14  have been applied to a state sentence, just -- you know, the

15  defense may ask us to put in -- ask me to put in a

16  recommendation just to flag the issue for them so they can look

17  at it, and hopefully, at least from the defense side and

18  probably mine because I agree with it, give him credit for that

19  because it seems to be accurate.

20      What you're asking me to do is the opposite, though, is to

21  make a recommendation that they give -- that they not give

22  credit for time that the Government, it seems, and likely the

23  Court also agrees should be counted.  So you're asking me to

24  recommend that BOP violate 3585, and I don't understand why I

25  should do that.

1          MR. PARADISO:  No, Your Honor, we're not asking you

2     to violate 3585.  According to Paul Ervy, who provided a

3     declaration --

4          THE COURT:  Paul Ervy is not -- I mean, what is he?

5     He works there.  Is he an expert on the law?  I mean, I don't

6     understand that part.

7          MR. PARADISO:  Yes, Your Honor.  He is the general

8     counsel for the BOP and dealing with incarcerations, and based

9     on BOP policy, if the Court were to put in a recommendation,

10    the BOP would follow it.

11         THE COURT:  Did you give him the specific set of

12    facts, that you're asking the Court to make a recommendation

13    that they count time -- or not count time that actually should

14    be counted?  And they're going to just take my word for the

15    idea -- not necessarily that I would say legally it has to

16    be -- it can't be counted, because I don't think I would say

17    that.  The most I would say is the parties think that this

18    should -- or agreed, which, again, there is a factual question

19    there, but the parties took the view or the judge just sort of

20    in the abstract thinks that this time should not count even

21    though legally it probably should count.  You really think he's

22    going to take that and say, well, now we're not going to count

23    it?

24         Wouldn't that invite the kind of motion that came up in --

25    I mean, you cited several unpublished cases in which there was

1    a 2255 or some other motion filed saying that the BOP erred in

2    not counting certain time.  Wouldn't that just invite that kind

3    of a motion?

4              MR. PARADISO:  No, Your Honor.  When you issue your

5    sentence, you say I took this time into consideration when

6    coming up with X months, and you put that into the

7    recommendation, which is telling BOP that time has already been

8    considered when you, the judge, came up with the sentence;

9    therefore, the person should not be given double credit for it

10   again.  So whatever your sentence may be, even if you come down

11   to 180 months --

12             THE COURT:  I guess, again, the way I would have done

13   this if it were -- if what you're actually saying is the

14   appropriate sentence should be 27 years basically, and I were

15   to agree that the appropriate sentence should be 27 years, why

16   wouldn't I have given a 27-year sentence?  Or if I felt that

17   this time was going to not count and that would be somehow

18   unfair to give a downward departure of six years and say, well,

19   I really want to give a 27-year sentence but since these six

20   years are going to count -- are not going to count, that would

21   be unfair.  So I'll give a lower sentence so that the effective

22   total amount of time is 27 years.

23        I've never heard of anyone saying, well, you know, this

24   time doesn't actually count or shouldn't count -- I'm sorry.

25   This time should count, but I'm just going to give a 21-year

1 sentence and say, actually, I don't think you should count

2 these six years even though legally they should count.

3      I don't understand what you're asking me to do other than

4 trying to get you within your plea agreement.  Why shouldn't I

5 just say, look, if I agree with all of your arguments on the

6 appropriate amount of time, why shouldn't I just say the

7 sentence should be 27 years and let the parties decide whether

8 they want to go to trial and accept that, withdraw from the

9 plea agreement, or just accept the sentence?  Why isn't that

10 the right way to do this?

11      MR. PARADISO:  It's obvious, Your Honor, you can do

12 that; however, it's the Government's position that in the plea

13 agreement, the parties had come in paragraph 10 to an agreement

14 of the time, which we factored in --

15      THE COURT:  So can you answer my question about

16 whether the Government actually believed at the time of the

17 plea agreement that this time would or would not have counted?

18      MR. PARADISO:  We believed it would not count based

19 on the wording in the plea agreement, if that makes sense, Your

20 Honor.

21      THE COURT:  Is it your position that the parties can

22 negotiate away the law and say, well, even though under 3585 it

23 would count, we choose to decide that it's not going to count,

24 and we're going to get the judge to agree with us even though

25 the law says it counts?  Explain to me what the thought process

1    was there.

2            MR. PARADISO:  So it was our thought process, Your

3    Honor, that, yes, we could put language into the plea agreement

4    where we could come to an agreement and then advise the Court

5    of, hey, we've already taken this into account in coming up

6    with our range, which is below the sentencing guidelines, and,

7    therefore, we're asking the Court to accept that and not give

8    him the credit.

9            THE COURT:  Where in the plea agreement does it say

10   we're going to recommend no credit for those six years?

11           MR. PARADISO:  As I said before --

12           THE COURT:  Where is the Court even authorized to

13   make that decision?

14           MR. PARADISO:  As I said before, Your Honor, it was

15   inartfully crafted; however, when looking at paragraphs 9 and

16   10 together where we are asking the Court to accept what the

17   parties have come to an agreement on, we would tie those two

18   paragraphs together to say that's how we --

19           THE COURT:  So is it accurate to say that at the time

20   of this, the Government actually thought legally that those six

21   years would not count and that's why you agreed to 252?  Or is

22   it that you thought the six years would count, but you thought

23   it would be better to do it this way, or that's how you would

24   get an agreement and then ask me to somehow erase those six

25   years even though they actually do count?

1          MR. PARADISO:  If I recall, Your Honor, in our

2    discussions with the defense -- and they can probably chime in

3    on this when they do -- we had some discussions about the time

4    and with Irish custody.  So when we created our range, we

5    factored that in to come up -- at least when the Government

6    came up with a range, we factored that in.  We had a

7    discussion, and we put that language into the plea agreement,

8    and it was our understanding that that took into account -- and

9    I know that's poor language -- the time in Irish prison so that

10   we could then come up with a range of 188 to 252 months, and

11   the defendant would not get anything lower than that.

12          THE COURT:  So can you give me a case in which this

13   actually was done and upheld or at least not reversed?  I mean,

14   again, the cases you gave me where you said -- I think you

15   cited something along the lines of, well, we tried to -- you

16   know, courts try to honor the plea agreement, which I'm not

17   even sure that's a fair characterization because it's not my

18   agreement.  I didn't have anything to do with this agreement.

19          The only issue here is that because it's a (C) plea, I

20   either have to accept it or give the defendant a chance to

21   withdraw, and maybe I'll consider doing that, but I don't have

22   any -- I was not part of that negotiation.  I have no

23   obligation to try to do that.

24          But even if courts do that, I think the example that you

25   gave was -- let me see if I have it here.  One example is this

1  case *U.S. vs. Dean* in which they said, well, the way to fix

2  this is to change the actual number of the sentence.  That's

3  how we effectuate the parties' intention is to reduce the

4  defendant's sentence so that what the parties intended can be

5  established.

6       And so we could do the same thing here.  We could raise

7  the sentence to meet what you're saying the parties agree to.

8  That just takes us out of the plea agreement.  But this case

9  doesn't say, well, the way you get to the parties' agreement is

10  to have a judicial recommendation that time that's not supposed

11  to count -- that is supposed to count doesn't count.  It says,

12  "Move the number of the actual sentence to a place that

13  actually leads to the result that the parties intended."

14       So am I correct that that's all you have?  You don't have

15  any cases in which the judge has actually made the kind of

16  recommendation you're suggesting in order to get to a number

17  that the parties had agreed on, rather than actually moving the

18  sentence to the place that gets to the point where BOP can

19  apply the law accurately and reach that result?

20            MR. PARADISO:  Yes, Your Honor.  We did not find any

21  cases related to that.  Unfortunately, or fortunately, there

22  are not many cases dealing with this issue.  As you said, we

23  found a number of unpublished cases.

24            THE COURT:  I mean, that was an unpublished case.

25  Again, that one they say -- I mean, I've never heard of the

1  idea that the courts have to just do what the parties want.  I

2  mean, we do have to accept the plea agreements in the

3  11(c)(1)(C) context if we want to move forward with that, but,

4  I mean, again, here they said, look, the parties had an

5  agreement.  The way you fix this is have the judge or the Court

6  reduce the sentence number to get to the end result that

7  everyone intended.

8       So, again, if this was not a (C) plea, you probably should

9  be asking me to raise the sentence number up to 27 years.

10  Right?

11            MR. PARADISO:  Yes, Your Honor.

12            THE COURT:  That would be a more straightforward way

13  to do this.

14            MR. PARADISO:  Yes, Your Honor.

15            THE COURT:  But obviously you're not asking for that.

16            MR. PARADISO:  No, Your Honor.  We don't want to

17  throw the plea agreement out.  That's why we spoke with BOP and

18  asked them how they handle these types of situations, and it

19  was them who was saying that as long as the judge puts a

20  language, if Your Honor is agreeable to do that, in the JNC

21  saying that you took the full time, part of the time, or none

22  of the time into account, then they would abide by what the

23  judge has ruled on the issue.

24            THE COURT:  So they really would?  So let's take this

25  into -- I mean, this is -- I mean, part of the problem is we

1    don't actually know.  I don't think I have a clear record on

2    whether this Irish time would count.  I mean, some of these

3    cases that you've provided, the parties thought that the time

4    was never credited to another sentence, and then when they

5    actually really dug into it, they figured out, well, actually

6    it was.

7         And so I'm just going off of what the parties are saying,

8    but you're seeming to say that this was never credited to

9    anything else.  Perhaps the idea was you had a view that

10   because it's foreign time, it doesn't count.

11        And so if this was a domestic situation -- let's make it a

12   little bit easier -- and we had a state -- we had somebody who

13   spent a year in state custody on the exact facts that were at

14   issue here.  There might have been state charges but the

15   charges were never -- there was never a conviction.  So that

16   one year of time under 3585 absolutely would count.

17        And then you're saying that if, as the judge, if the judge

18   just put in the judgment, "Don't count that time.  I didn't --

19   I don't want you to count that time.  My sentence was based on

20   the idea that you weren't going to count that time," that BOP

21   would just say, okay, we're not going to count the time.

22        And that once the defense filed one of these 2255 motions,

23   the appeals court would then say, of course not.  The judge

24   said don't count it so don't count it.  Is that your position?

25             MR. PARADISO:  So, Your Honor, yes.  So if you were

1   to put that time --

2          THE COURT:  Because Mr. Ervy said it was okay, then

3   that's what we should do.  That's what the appeals court would

4   say?

5          MR. PARADISO:  No, Your Honor.  So if Your Honor had

6   calculated that already in -- so let's say you're going to give

7   a five-year sentence and say, hey, I see you spent a year in

8   state custody.  Instead of five years, I'm giving you four.

9   I've taken that into account.  I'm giving you credit for that

10  time.  Then BOP would abide by that and not give him credit for

11  that time because he's already received it.

12      And that's what we're asking for here.  We've already

13  given him credit for that time by coming down from the

14  sentencing guideline range.

15         THE COURT:  You have.

16         MR. PARADISO:  Yes, Your Honor.

17         THE COURT:  -- probably doesn't see it that way.  I

18  mean, aren't you just asking me to fix your mistake?  Is that

19  what you're asking for?

20         MR. PARADISO:  No, Your Honor.  I'm asking you to

21  enforce the agreement that the parties had in their plea

22  agreement, which is that that time has already been taken into

23  account when we considered the range that we came up with, both

24  parties agreed to.  We've already considered that he spent, you

25  know, almost six years in the Irish prison.  So we've come up

1  with this, you know, 180 to 252 range; because otherwise, his

2  time that he would go to jail would be below the mandatory

3  minimum of 15 years.  So we've considered that.

4          THE COURT:  What -- I mean, if -- I don't understand

5  that part.  You've lost me there.

6          MR. PARADISO:  Yes, Your Honor.  So we considered

7  that --

8          THE COURT:  If he gets a 15-year sentence and time is

9  counted toward that time where he's actually sitting in a

10  prison, why is that below a mandatory minimum sentence?  I

11  don't understand that.

12         MR. PARADISO:  Because he hasn't served time in

13  federal prison yet, and that's what we're trying to do is make

14  sure he serves the adequate amount of time in federal prison.

15         THE COURT:  I'm looking at Mr. Ervy's declaration

16  again.  Okay.  So just to clarify, if I were to conclude that

17  the appropriate total time to be served should be 27 years,

18  which is basically the Government's position, is that 252 plus

19  the 6 years that he's already served that don't -- shouldn't

20  really count, but I were to conclude that I can't or shouldn't

21  make the recommendation you're asking for, you would prefer

22  that I just sentence to 252 and let BOP do what it does?  Or do

23  you prefer that I sentence to 27 years and see what happens?

24         MR. PARADISO:  One second, Your Honor.

25      (Brief pause.)

1     MR. PARADISO:  Your Honor, the Government is not

2  going to ask you to sentence outside of the plea agreement

3  because that's, obviously, what we came to an agreement with

4  the defendant, and we would be violating our agreement.  We're

5  just asking for the Court to enforce the terms as they are

6  written and as BOP has told us this is the way to ensure that

7  they are effective.

8     THE COURT:  Okay.  Thank you.  Anything else you want

9  to add in general?

10     MR. PARADISO:  Yes, Your Honor.

11  As I stated, 252 months and a lifetime of supervision in

12  this case is the appropriate sentence based on the plea

13  agreement between the parties.  Thank you.

14     THE COURT:  Thank you.

15  Mr. Hurson.

16     MR. HURSON:  Thank you, Your Honor.

17  I rise to defend Mr. Marques but not his actions because

18  in many ways I agree with a lot of what the Government

19  summarized with respect to the images that were found on the

20  server.  There can be no excuse for that behavior.  The

21  creation of those images, the sharing of those images, we, as

22  we said in our memo, recognize, as does Mr. Marques, that there

23  must be punishment for facilitating the advertisement, for

24  conspiring to advertise these materials and, to be frank,

25  conspiring to facilitate the distribution of these images.  We

1   agree.  He must be punished.

2       But the question before the Court is obviously not whether

3   he should be punished.  It's how much time is sufficient but

4   not more than necessary, and we submit that that is a sentence

5   of 15 years.

6       And in the two years since Mr. Marques was brought to our

7   shores here in the United States, my colleague, Ms. Grace, and

8   I have had the honor to get to know him and his family quite

9   well.  As you can imagine, given the nature of this case and

10  given Mr. Marques' somewhat peculiar position as being

11  essentially a complete outsider to the United States, we've

12  spent a significant amount of time with him, perhaps more than

13  we have with other people; and I can say with confidence that

14  he and his family recognize that what he did was wrong, that he

15  has and will tell the Court that what he did was wrong,

16  apologize for it, and he accepts that he must be punished.

17      What I would like to do and the way I would like to

18  structure my presentation to the Court is to begin by

19  discussing some of the factual corrections I would like to make

20  to what the Government has submitted.  I would like to move at

21  that point into discussing, if Your Honor wants to continue the

22  conversation about the language that the Government suggests

23  and our view on that to the extent it's not already briefed,

24  discuss a little bit of the 3553(a) factors and how they apply

25  to Mr. Marques.

1          Ultimately, our request is for 15 years in prison and
2     15 years of supervised release, and I would note at the outset
3     that the presentence report includes a long list of recommended
4     conditions for supervised release.  We agree with all of them.
5     We've also reviewed with Mr. Marques the Court's standing
6     orders on required conditions of supervision and additional
7     conditions, and we agree with all of those.

8          Moving into the discussion of corrections, and I want to
9     make it clear that it may be that this means very little to the
10    Court, the corrections that I'm about to make.  It may not be
11    of significance to you, and I completely respect it if it
12    isn't, but I want to make sure because a lot of our filings, if
13    not all of our filings, has been under seal for various
14    reasons.  We have not been able to, nor has Mr. Marques been
15    able to see or his family to hear a response to what we contend
16    are factual misstatements that have been made by the Government
17    not just today but in some of their filings.

18         And I'd also note that this is an interesting case in that
19    Mr. Marques was extradited from a foreign country, the great
20    nation of Ireland, and in making the request to extradite him,
21    it was repeatedly stated to the courts in Ireland that
22    Mr. Marques would be treated fairly in the United States and
23    that his due process rights would be unequivocally protected,
24    and the most basic due process right is to be prosecuted and
25    sentenced on the truth.

1        And I want to make clear that some of what I'm going to

2   offer to the Court right now is to refute not that his conduct

3   was illegal, it's not to go outside the confines of the

4   Statement of Facts, but I want to be clear that when you do

5   make your decision on sentencing, that you do so recognizing

6   the truth of what happened in this case.

7        And so there's a few misstatements I would like to

8   address.  One is that Mr. Marques made $3.6 million from

9   Freedom Hosting.  That is false.  Mr. Marques did not make, as

10  the Government repeatedly states, money off of this conduct.

11  There is absolutely no dispute that Mr. Marques ran legitimate,

12  I would call them -- in fact, I would call them more legitimate

13  web hosting services since he was in secondary school,

14  essentially our high school.

15       And I'm putting on the Elmo a document that was provided

16  to us in discovery, which is an FBI report.  I do not intend to

17  enter these into the record unless Your Honor wants me to but

18  I -- so I have not labeled them as exhibits but I can.  This is

19  just to show, for example, zooming in on this FBI report that

20  was drafted by one of the agents assigned to this case, the FBI

21  determined -- and I've highlighted the language -- that

22  Mr. Marques was the administrator/owner of a web hosting

23  company called Host Ultra.  This report goes on to describe

24  Host Ultra, which was a legitimate web hosting business that

25  Mr. Marques ran in Ireland and that his father was actually a

1   partner on, at least in the papers.  The Government knows that.

2       And the Government knows that Mr. Marques was paid for his

3   legitimate web hosting services well in advance of Freedom

4   Hosting's creation.  And, in fact, turning the Court's

5   attention of Document 14-1, which is the complaint filed in

6   this case, originally Your Honor, if you recall, this was a

7   complaint, an amended complaint, and later an indictment.

8       I'm turning to page 4, and, again, I've highlighted the

9   language at the bottom, "There is probable cause to believe

10  that Marques is the operator of a free, anonymous, web hosting

11  service."  That language is repeated later.  "Anonymous hosting

12  service operates through an anonymous website on the network

13  and offers free hosting."  Later it says, "The services were

14  offered for free, but an option to pay the equivalent of $5 was

15  added on July 16, 2013," which is just, as you know, a few days

16  before Mr. Marques was arrested.

17      The Government notes in countless -- I can't say they are

18  countless but a number of search warrant applications that

19  Freedom Hosting was a free service, and, in fact, in the

20  Government's objections to the presentence report, which it

21  filed in this court, you will recall, as we talked about in the

22  beginning, there was a possibility that a different guideline

23  range would apply to -- or, rather, a different category of

24  guidelines would apply to Mr. Marques' conduct, and the

25  probation office originally had assessed that different

1   guideline range, 2G2.2.

2       Now, you'll note that 2G2.2 incorporates a number of

3   factors that 2G2.1 does not and one of those is an increase if

4   the defendant made money from his behavior.  Now, we objected

5   to that application and so did the Government, and it said,

6   when it objected, that the defendant also earned money from

7   providing commercial hosting services other than Freedom

8   Hosting.

9       Though the parties agree that the defendant earned money

10  from hosting services, which was used to commit or promote the

11  commission of his offense, there is insufficient evidence to

12  calculate how much can be properly attributed.  The point being

13  the Government acknowledged that they don't have the evidence

14  to prove that Mr. Marques made money from this and stated the

15  same to the Court.

16      And the reason --

17            THE COURT:  So, Mr. Hurson, just to clarify.

18            MR. HURSON:  Certainly.

19            THE COURT:  I understand you're taking issue with

20  these large numbers, three million, et cetera.

21            MR. HURSON:  Yes.

22            THE COURT:  The Statement of Facts says Marques

23  admitted to hosting his server, and the only server referenced

24  at that point is Freedom Hosting.

25            MR. HURSON:  That's correct.

1      THE COURT:  Stating that the business has been very

2  successful, and he's earned a substantial amount of money from

3  his endeavors.

4      Are you arguing that there is no evidence that he earned

5  $1 from any of this; that he made no money?  Is that your

6  argument?

7      MR. HURSON:  My argument is that the evidence

8  support --

9      THE COURT:  I mean, isn't that an admission that he

10  made money?  I mean, you could argue, well, it wasn't from this

11  particular part of the child pornography, this particular web

12  page; but he basically says, "I made money from hosting

13  freedom" --

14      MR. HURSON:  Well, what he said.

15      THE COURT:  -- and are you now backtracking from

16  that?

17      MR. HURSON:  I'm not intending to backtrack at all.

18      THE COURT:  Well, are you or aren't you?

19      MR. HURSON:  I am not.

20      THE COURT:  It sounds like you are.

21      MR. HURSON:  Well, I'm sorry if that's what it sounds

22  like because I'm not.

23      THE COURT:  So you're acknowledging that he made

24  money.  You're just taking issue with the amount of money?

25      MR. HURSON:  No.  I'm acknowledging -- I'm taking

1  issue with two things.  Mr. Marques has hosted websites since

2  he was in high school, at least 2003.  I'm taking issue -- and

3  he admits that.  And when he says he was successful at doing

4  that, what he's talking about and what he was talking about in

5  Ireland when he was testifying in his extradition proceeding

6  was that he was successful in hosting legal websites.

7          THE COURT:  That's not what this says.

8          MR. HURSON:  In the Statement of Facts?

9          THE COURT:  I mean, it says he admitted to hosting

10  his server.  The only server referenced is Freedom Hosting.

11  Stating that the business has been very successful, and he's

12  earned a substantial amount of money from his endeavors.

13      Now, you may be able to argue that it's more indirect than

14  saying that he charged by the dollar for child pornography,

15  but -- I mean, I'm not sure why we shouldn't just blow this

16  whole thing up.  The Government doesn't like the plea

17  agreement.  You're backtracking from the Statement of Facts.

18          MR. HURSON:  I'm not --

19          THE COURT:  Maybe we should just start over and go to

20  trial.

21          MR. HURSON:  No, I don't want to start over and go to

22  trial.

23          THE COURT:  I mean, I'm getting very close to saying

24  that that's what should happen here because clearly both sides

25  don't like what they agreed to.

1          MR. HURSON:  No, it's not that.  And I don't mean --

2          THE COURT:  You're saying he didn't make a dollar off

3   of this whole thing?  That seems totally incredible to me.

4          MR. HURSON:  The evidence that the Government

5   provided us in discovery is that the money that --

6          THE COURT:  I mean, he admitted to this in the

7   Statement of Facts.

8          MR. HURSON:  And we acknowledge --

9          THE COURT:  Hold on a second.  We have a technical

10  issue with the public access line.

11         MR. HURSON:  Okay.

12         THE COURT:  So why don't we pause.

13     (Brief pause.)

14         THE COURTROOM DEPUTY:  We're reconnected, Your Honor.

15         THE COURT:  Okay, thank you.

16     Go ahead, Mr. Hurson.

17         MR. HURSON:  Thank you, Your Honor.

18     Backing up for a second, this issue of the 3.6 million

19  came out of left field for the defense.  Never during the

20  pendency of this case was that ever discussed.

21         THE COURT:  So is it also out of left field for the

22  defense to argue that he didn't make a dollar off of this?

23         MR. HURSON:  I don't mean to --

24         THE COURT:  It seems like it does.

25         MR. HURSON:  And I apologize if that's the case.

1          The paragraph in the plea agreement that you are

2     referencing is a direct attribution to testimony that was given

3     in an extradition proceeding in Ireland, and I am not in any

4     way trying to back out of the plea or the admissions.  All I

5     can tell you is --

6               THE COURT:  It sounds like you are.

7               MR. HURSON:  And I'm sorry.  What I'm saying -- and

8     the Government -- I don't mean to be incredulous about it, but

9     the evidence that was presented to us in the actual transcript

10    of what transpired in Ireland was not that money was made off

11    of Freedom Hosting.  It was that he made money off of hosting

12    other sites.

13              THE COURT:  Why does that matter to the case then?

14    Why is that even in the Statement of Facts?

15              MR. HURSON:  It's in the Statement of Facts because

16    it's in the Statement of Facts is, frankly, the simplest

17    answer.  The Statement of Facts was provided to us --

18              THE COURT:  So it's like the other part of the plea

19    agreement.  You left it in there because you thought you could

20    argue your way out of it.

21              MR. HURSON:  No, no, I --

22              THE COURT:  That's what you're doing now.

23              MR. HURSON:  And I apologize if that is the

24    impression that the Court is getting because, again, we

25    acknowledge that the money that was seized from Mr. Marques'

1   account, which was $154,000, was used to facilitate the

2   commission of the offense.

3           THE COURT:  So, again, you're arguing that he made

4   not one dime off of this child pornography.  Not one dime.

5   That's your argument?

6           MR. HURSON:  I am saying that the admissions that we

7   made were not intended to give that impression.  But I will say

8   this, I don't know the whole realm of websites that were hosted

9   in other areas, but I do know this, that the Freedom Hosting

10  server -- that's why I'm focusing on Freedom Hosting -- was

11  offered for free.  The Government agrees with that in all of

12  its search warrant applications and everything else.  The

13  evidence provided to us was that no money was made off of

14  Freedom Hosting.

15      The bank account records that were provided to us show

16  that payments were made for Host Ultra and other hosting

17  services, and when questioned in Ireland about his activities

18  for the purposes of bail, there was a question about "Do you

19  host websites?"  And he said, "Yes," which is true because he

20  hosts websites in a variety of different forums.

21      And when it came time to assess the sentencing guidelines,

22  when the probation office mistakenly attributed the $154,000 to

23  being financial gain from his activities, the parties both

24  agreed that it was not financial gain; it was used to commit

25  the offense.

1           The Freedom Hosting server was free.  That is absolutely

2     the truth, and the Government has provided that information to

3     us.  Everything I'm showing to you is that Freedom Hosting was

4     free.

5           And I am not trying to back out of any of Mr. Marques'

6     acceptance of responsibility because he hosted Freedom Hosting.

7     He ran it; 100 percent agree with that.  But up until July,

8     right before his arrest, it was absolutely a free service, and

9     there is no evidence that anyone provided him money

10    specifically for the purpose of hosting this material.

11          I'm not saying he didn't host it.  And when I said it at

12    the beginning, I don't know if this matters or not, but it

13    is -- I cannot say --

14          THE COURT:  It matters because your credibility is in

15    question; that's all.  That's the only reason it matters.

16          MR. HURSON:  Your Honor, I'm sorry to hear that

17    because the evidence that I am putting before the Court is what

18    we were given.

19          THE COURT:  Okay.  Keep going.

20          MR. HURSON:  The other issue is when was Freedom

21    Hosting running?  How long was it operating?  And this also

22    plays into the Government's calculation of 3.6 million.  The

23    evidence that was provided to us was that Freedom Hosting began

24    in July of 2008, and that was the indictment; that was the

25    complaint; that was the admission that we made in the Statement

1  of Facts.  That's because that's the truth.  Freedom Hosting

2  was created in July of 2008.

3       The Government says, in making its calculation of

4  $3.6 million, the only way you get to that calculation is

5  taking the $30,000 a month and extending that back to 2003.

6  There was no Freedom Hosting in 2003, and the Government

7  acknowledges that -- or did.  And so at least from 2003 until

8  July of 2008, there was no Freedom Hosting, and that we know

9  because that's what the evidence showed.  The search warrants

10  in the case said that.  The complaint said that.

11       And to the extent that Freedom Hosting indicated that in

12  that five years of reliable service, which is something that

13  the Government offered in its presentation to the Court as some

14  sort of admission that Freedom Hosting had existed prior to

15  2008 has to be looked at slightly closer.  In discovery, the

16  Government provided several copies of what the Freedom Hosting

17  front page looked like.  It is true that the front page of

18  Freedom Hosting in 2013, which I am putting on the overheard --

19            THE COURT:  Okay.  I think we're going to need --

20  everything needs to be marked as an exhibit.

21            MR. HURSON:  Okay.

22            THE COURT:  Because, honestly, I do not like the

23  Government just making factual proffers, and I also don't like

24  the defense just making factual proffers.

25            MR. HURSON:  Okay.

1          THE COURT:  If there are really all of these factual

2     disputes, maybe we should continue the sentencing hearing and

3     have an actual evidentiary hearing.

4          MR. HURSON:  Well, I don't think --

5          THE COURT:  This is really not productive to have

6     both sides throwing out facts.  They said 3 million.  You say

7     no.  How am I supposed to know without actually having

8     evidence?  I mean, clearly there is a huge disagreement.  I

9     mean, there seems to be an agreement in the Statement of Facts

10    that he made some money but maybe not any specified amount.

11    Now neither side wants to accept that.

12          MR. HURSON:  Let me apologize again because --

13          THE COURT:  I don't need an apology.  I just --

14    neither side agrees with what's in the Statement of Facts

15    anymore.

16          MR. HURSON:  No, it's not that.  And this is why I'm

17    going back to the filing of last Wednesday.  We had no idea

18    that this was going to be what the Government was going to say,

19    and that is why I'm coming before you as I am with documents

20    from discovery, which I would say is more than just a proffer,

21    and I'm happy to mark them and present them, but they are all

22    from the Government.  These are not things I have found on my

23    own.  These are not new items.

24         But I cannot be clear enough that what the Government has

25    written and said, a lot of it is just false, and I can't sit

1   here -- and it's very difficult to undo that.

2          THE COURT:  I mean, what I seem to think the issue

3   is, is the Government is saying he made a lot of money hosting

4   servers.  Your position is that that money had nothing to do

5   with child pornography.  It was on servers that had absolutely

6   nothing to do with child pornography.  Is that your position?

7          MR. HURSON:  My position is that we pled guilty --

8   yes.  Yes.

9          THE COURT:  Absolutely nothing to do with child

10  pornography?

11         MR. HURSON:  What I am saying is we pled --

12         THE COURT:  Not a single dollar came from child

13  pornography --

14         MR. HURSON:  Mr. Marques --

15         THE COURT:  -- directly or indirectly?  That's your

16  position?

17         MR. HURSON:  Mr. Marques pled guilty to running

18  Freedom Hosting, and the evidence in the case did not show that

19  he made any money from Freedom Hosting.  He did make a lot of

20  money from hosting websites, and there are bank records to

21  prove that.  That money came into his Bank of America account.

22  That money came into PayPal accounts.  I don't believe it was

23  anywhere near the 3.6 million, because let's not forget that

24  that number comes off of an uncounseled interview with Pretrial

25  Services, which none of us were present for, where they asked

1   him to estimate what his income had been six years prior.

2   Typically that's what they do.  We don't know what happened in

3   that interview.

4        But I do know this -- and I'm not trying to be

5   disingenuous at all.  Quite the opposite.  I'm trying to show

6   Your Honor with the evidence that what we're saying is that he

7   did make money hosting websites.  He's been doing that his

8   whole life, but that Freedom Hosting, what we pled to, what we

9   admitted to, was not making money off of that.

10            THE COURT:  Let me just clarify by asking

11   Mr. Paradiso and see if he agrees with that or not, because

12   you're saying this all comes from his facts.

13            MR. HURSON:  Yes.

14            THE COURT:  Do you agree with that, Mr. Paradiso?

15   The money comes from different websites or does it come from

16   Freedom Hosting?

17            MR. PARADISO:  Your Honor, we're going by what the

18   defendant stated his employment record was in paragraph 64 of

19   the PSR, that he was the web host, and he was making $3,000 --

20   I'm sorry, $30,000 a month from 2013.  And they were talking to

21   him about Freedom Hosting.  So we're relying on the defendant

22   as what he said.

23            MR. HURSON:  Your Honor, if I may respond?

24            THE COURT:  What paragraph are you referring to?  Say

25   that again.

1          MR. PARADISO:  64, paragraph 64, Your Honor, of the

2    presentence report.  I apologize.

3          THE COURT:  Okay.  I mean, that seems along the same

4    lines as what Mr. Hurson is referring to is that it's perhaps a

5    little ambiguous as to whether that's from Freedom Hosting or

6    some other independent work but -- so, I mean, I'm not sure I

7    --

8          MR. HURSON:  That's all I'm saying.

9          THE COURT:  -- rely entirely on that.

10          MR. HURSON:  That's all I'm trying to say.

11      And I think the better question is -- the Government, up

12    until reading that line, has always maintained that there was

13    no financial profit from Freedom Hosting.  That is true.  And I

14    don't mean to sound incredulous.  I just -- this is -- the

15    reason why I'm perhaps sounding that way is because we have

16    always agreed that he made money off of hosting websites, but

17    it has never been the contention that he made the money off of

18    Freedom Hosting; and I apologize if that message was sent

19    differently, but I don't think it changes his guilt.  It

20    certainly doesn't change his guilt.

21          THE COURT:  Okay.  Why don't we move on to the next

22    issue.

23          MR. HURSON:  The next issue is whether he invited

24    people to join, that everyone who was hosting the website had

25    to be invited by Mr. Marques to host the website.  That is not

1    -- that is not true.

2        I think in the Government's response they have addressed

3    this issue by saying, well, it's true that users were allowed

4    to invite other users, but because it is his server, he, in

5    essence, has constructive control over everyone on it.  And I

6    guess that is true because he is the host of the server, and at

7    any point if he shuts down the server, then all of the sites go

8    away.  The ones he knows about, the ones he doesn't know about,

9    they all disappear; that is true.

10        But what is not true is that every single person hosting a

11   website on Freedom Hosting was hand-selected and approved by

12   Mr. Marques.  The evidence is that up and until 2011, I

13   believe, hosting on Freedom Hosting was open to all.  In 2011,

14   following a series of attacks and hacks, Freedom Hosting went

15   to an invitation only, but it was an invitation that could come

16   from other current users, not Mr. Marques.  Other users who had

17   already established websites were allowed to invite other

18   people to join and they did, and in just the weeks before his

19   arrest, they had gone to a $5 fee, although I don't know if

20   there is any evidence as to how many of those $5 fees they took

21   in; but the bottom line is it is not true to represent that

22   Mr. Marques hand-selected everyone who hosted on Freedom

23   Hosting.  That's just not the facts.

24             THE COURT:  Okay.

25             MR. HURSON:  The next issue would be the number of

1  images, and as I set the record straight on the number of

2  images, I want to be clear on what I'm referencing.  I am

3  referencing a report, the sort of definitive report that was

4  provided by the Government outlining what images were found on

5  the Freedom Hosting server.

6      And backing up for one second, the Freedom Hosting server

7  was a server that had users, 5,444 users.  Half of those,

8  approximately, were not hosting any material or actually being

9  active at all, and some of those users put websites up on

10  Freedom Hosting.  Some of those websites involve child

11  exploitative material, CEM, CSAM is another term.  We take no

12  issue with whatever term it is, but ultimately, when the

13  Government analyzed the Freedom Hosting server -- these numbers

14  are included in our responsive memorandum, but I want to note

15  them for the record -- the ultimate number of 8.5 million was

16  correct in that they found 8.5 images of child pornography or

17  what they thought was suspected child pornography, and we

18  absolutely agree with that number because that is true.  Those

19  were the images that were taken off of the computer.

20      The Government's filing ultimately left off the back end

21  of that, the suspected, because what ultimately was found on

22  the server -- and, again, I go back to whether this matters or

23  not, but I want to make sure the facts are out there -- is that

24  close to 6 million of those images were labeled to be

25  indicative or CEM age difficult.  And what that means from a

1    legal point of view, from the FBI's point of view is defined on

2    the second page -- and I noted this in our filing -- is that

3    these were either depictions of children not involved in sexual

4    activity or files that might be, may be child exploitation but

5    are age difficult or questionable.

6         Ultimately, the total number of images that were found is

7    somewhere close to 900,000, and as some of those were

8    duplicates, the ultimate number lies somewhere in the 2 to

9    315,000 range.  Again, in no way does this excuse the conduct,

10   but I want to make sure that the record is clear.

11         THE COURT:  I've just never seen this scenario where

12   the defense gets up and -- you know, he has admitted

13   8.5 million images or videos of CEM or suspected CEM --

14         MR. HURSON:  That's correct.

15         THE COURT:  -- and then you get up there and rather

16   then negotiate it with the Government at the time of this and

17   say, no, we don't want 8.5; we want the number that takes out

18   the suspected things, you say, we're going to leave the number

19   in there and then at sentencing we're going to argue that that

20   number actually doesn't mean what it means.  This is the second

21   time you're doing this.  Why didn't you just negotiate that

22   with the Government and say, look, 8.5 is not the right number?

23         MR. HURSON:  Well, I don't want to get into the plea

24   negotiation, but perhaps we did, except for this.  We did not

25   anticipate that the Government would make the claim until last

1   Wednesday at midnight.  All along we were operating under what

2   we thought was the same set of facts as the Government, which

3   was that, yes, there were 8.5 million images but it was either

4   child pornography or suspected child pornography.

5        The fact that the Government would file a sentencing memo

6   that took off the back end of that argument, it totally came

7   out of left field for us.  And I'm sorry but I don't want you

8   to think that we were somehow sitting on this Statement of

9   Facts and waiting, let's get to court and pull out all of these

10  documents.  It wasn't that at all.  We came in here today

11  prepared to discuss --

12       THE COURT:  I just don't understand why you would

13  agree to 8.5 if you didn't expect them to use it.

14       MR. HURSON:  Because it is 8.5 million images that

15  they suspected or that were child exploitative materials.  That

16  is 100 percent true.

17       THE COURT:  That's the point is you want to have your

18  cake and eat it too.  I mean, suspected, I agree with you,

19  suspected isn't really that useful to anybody, although, as you

20  say, some of these, I guess depending on the age, you couldn't

21  tell from looking at them; but if you weren't prepared to hear

22  them use the number 8.5, then I'm not sure why you agreed to

23  this.

24       MR. HURSON:  I was prepared for the number 8.5, but I

25  was not prepared for the Government to take off the descriptor

1  "suspected."  Because what's in the Statement of Facts is

2  exactly what happened.

3          THE COURT:  So, again, maybe we can ask Mr. Paradiso.

4  Are you disputing that, you know, a large number of that is

5  suspected based on the documents Mr. Hurson is giving or are

6  you agreeing with that, that the 8.5 includes suspected?  I

7  don't know why we're having this argument if we're working off

8  the Government's documents.

9          MR. SULLIVAN:  The Statement of Facts says CEM or

10 suspected CEM.  That is our position.  We're not deviating from

11 the Statement of Facts.

12         THE COURT:  So to the extent that you may have

13 implied that it's 8.5 million of actual CEM, you're not --

14 that's not what you're trying to argue?

15         MR. SULLIVAN:  We are not trying to argue that.

16 We've never tried to argue anything other than what's in the

17 Statement of Facts.

18         THE COURT:  Okay.  So it seems like we're all in

19 agreement on that.

20     And do you have any reason to doubt the numbers that

21 Mr. Hurson put on the screen as being the Government's

22 analysis?

23         MR. SULLIVAN:  Your Honor, that is the Government's

24 analysis, but with respect to suspected, as this Court may

25 understand, since more than a million of those images are

1  people who have never been seen by law enforcement, they can't

2  say to a medical degree of certainty that these are actual

3  individuals -- or that they are of a particular age.  So the

4  fact that they are in that category does not mean that they are

5  not child exploitation material, but with respect to the

6  standards of saying is this a person that we can come into

7  court and say this person is a certain age, that is something

8  that cannot be measured.  But in no way is that detracting from

9  what's in the Statement of Facts.

10  THE COURT:  Okay.  So I don't know if we're that far

11  off here.  Are we, Mr. Hurson?

12  MR. HURSON:  The Government's sentencing memo said

13  they took eight and a half million images of child pornography,

14  and my point to the Court was that's not true but -- so we

15  aren't that far apart based on what the Government said.

16  Again, all I can respond to is what they wrote, and everything

17  I'm saying to the Court is in reaction to what they wrote --

18  THE COURT:  Okay.

19  MR. HURSON:  -- and, to some extent, said.  And I'm

20  just trying to use the evidence that I was given to elucidate

21  where the truth lies.

22  And I talked about the number of users on the site.

23  Ultimately, there were child pornography websites found on the

24  site, and, ultimately, as Mr. Marques admits, he visited at

25  least three of those sites, which are admitted in the Statement

1   of Facts, and visited them repeatedly.  It is not -- and I

2   don't think the Government is saying that -- correct to say

3   that he was an administrator of the site of Freedom Hosting.

4   He was not.

5       I do want to point out one thing that the Government said

6   with respect to the RAM from his laptop; the RAM was

7   unencrypted.  I believe the Government said they were unable to

8   access the RAM because it was encrypted, but the evidence is

9   that the RAM on the laptop was unencrypted.  And it is true

10  that the Government was only able to access three gigabytes of

11  that RAM, but that was not due to any encryption or efforts on

12  Mr. Marques' part.  That was due to the process of extracting

13  causing that to crash.  The Government did that.

14      I just want to make it clear there was no -- nothing on

15  that RAM that made it impossible to access, and, in fact, the

16  Government was able to access a portion of it before they

17  crashed it during the extraction process.

18      And so it is not wrong for the Government to speculate as

19  to what the additional RAM might have shown.  They are free to

20  have their thoughts on that, but the facts are what was

21  admitted to in the Statement of Facts and that's what was taken

22  off the RAM.

23          THE COURT:  Wait.  I'm -- you're saying the RAM was

24  not encrypted?

25          MR. HURSON:  That's correct, and the Government --

1          THE COURT:  None of it?

2          MR. HURSON:  The Government is the one would elicited

3    that testimony in Ireland and here.

4          THE COURT:  None of it was encrypted?

5          MR. HURSON:  Not the RAM, no.  The computer, of

6    course, had a password on it, but the RAM -- the Government

7    said in its presentation to Your Honor that they were unable to

8    extract more from the RAM because it was encrypted.

9          THE COURT:  Okay.  Again, page 13, Statement of

10   Facts, the remaining RAM was encrypted and law enforcement was

11   not able to access it.

12         MR. HURSON:  Okay, that is an error because that is

13   something we just found out, and that's my fault.  But, again,

14   my point here is to simply say this:  Mr. Marques ran Freedom

15   Hosting.  He hosted these sites.  A hundred percent sure.  He

16   visited these sites.  And in no way --

17         THE COURT:  Is that not a breach of the plea

18   agreement to say that you're backtracking from the Statement of

19   Facts?  I mean, tell me what you're doing.

20         MR. HURSON:  Well, I apologize.

21         THE COURT:  What are you trying to do?

22         MR. HURSON:  I was trying to -- I thought -- I had

23   missed that statement in the Statement of Facts and I

24   apologize.  I heard it for the first time this morning again,

25   and I apologize.  I will withdraw the argument based on that

1  because we are obviously trying to honor the plea agreement,

2  and to the extent that it sounds like I'm not, I will just move

3  on from these corrections because I don't want the Court to get

4  the impression that he is not accepting responsibility.  I just

5  wanted to make clear --

6          THE COURT:  It just seems to me that neither side

7  really likes the plea agreement.

8          MR. HURSON:  That's not true.  That is not true.

9          THE COURT:  You don't like the Statement of Facts

10 that you agreed to.  They don't like this number that you

11 agreed to.

12         MR. HURSON:  There is one line --

13         THE COURT:  I'm thinking maybe we should just start

14 over again.

15         MR. HURSON:  I don't believe we should start over

16 again.  There is one line that I agree I did just tell you was

17 not exactly what he said.

18         THE COURT:  Well, the statement about whether he, you

19 know, made any money and all of these other things.  I

20 understand you're trying to twist the words in a certain way,

21 but neither side -- I mean, the Government didn't admit it, but

22 I think you would agree with it; if they had to do it all over

23 again, they would have tried to get some different language

24 about this six years in Ireland, including you would rather

25 have a different set of facts here than you have --

1          MR. HURSON:  I don't mind --

2          THE COURT:  -- because I'm telling you what I think

3     this means, and you're saying, no, don't believe what it says

4     there or don't read it the way you read it, which means, as a

5     good lawyer, you would have wanted to redo it so that I read it

6     the way you think it should read; but clearly you don't like

7     the way it reads.  So --

8          MR. HURSON:  Well, I -- we admitted to the Statement

9     of Facts, and it may be that on a few lines we thought that

10    what was being written and said meant something different than

11    what the Government said last week in its filing, but I do not

12    believe that these are major modifications to the Statement of

13    Facts.  And they are not modifications at all, and I believe we

14    are on the same --

15         THE COURT:  You're talking about the RAM.  I mean, it

16    says specifically the RAM was encrypted.  Now you're saying

17    it's not.

18         MR. HURSON:  Well, and that was an error on my part,

19    but here's what's clear.  They couldn't access the RAM.  So to

20    the extent the Government is arguing that they couldn't have

21    accessed that RAM, that is true, and that was the point; but I

22    don't find that to be a major point except to say that they

23    couldn't access it.

24      I'm not trying to blow up the plea.  I'm not trying to

25    backtrack on the Statement of Facts.  And with respect to the

1    Statement of Facts and the profit that we talked about earlier,

2    we aren't far apart on that.

3         And, again, I'm sorry for sounding exasperated.  I did not

4    anticipate that the corrections would generate the response

5    that they did, and I am sorry for that, but what I'm not sorry

6    for is trying to respond to what was filed last week in the way

7    that we thought would be the best way to do it; but I am not

8    trying to walk away from his responsibility for what happened

9    in this case at all.

10        I know that there are a lot of family members in Ireland

11   listening to this, and when they read what was stated in the

12   notice of the witness, they were upset, and I have a duty to my

13   client to correct the record, not to dance around things.

14   Quite the opposite.  I was just trying to correct the record,

15   and I didn't believe there would be any opposition to it from

16   the Government because what I'm using is what the Government

17   gave to me.

18        With respect to the issue of the credit for time served,

19   our position is what we filed.

20             THE COURT:  So when the Government said -- I mean, I

21   don't know what that means, what you filed.

22             MR. HURSON:  Meaning my response.  We have a two

23   part --

24             THE COURT:  So will you acknowledge or will you not

25   acknowledge that your understanding at the time of this was

1    that he wasn't going to get any credit for these six years and

2    that's why they agreed to effectively a departure?  Because

3    there's nothing in the plea agreement that explains why the

4    Government is agreeing to a downward departure.

5              MR. HURSON:  The Government wrote the plea agreement,

6    and we discussed the plea agreement, and it's a little bit

7    difficult --

8              THE COURT:  I guess what I'm asking is did both sides

9    think that the six years weren't going to count, or did the

10   defense think it was going to count but then they just

11   sandbagged the Government and said, well, we'll just pretend

12   that we agree with them but actually we know in the end it's

13   not going to count or is going to count so we're actually going

14   to get another six years?

15             MR. HURSON:  Let me cut to the chase.  The

16   communications between the parties -- you asked the Government

17   what did they think when they wrote this plea agreement.  I'll

18   tell you what they thought.  We received an email from the

19   Government on January 19, 2020.  We were going back and forth

20   on a number of things about this plea agreement -- and that

21   doesn't matter.  You don't need to know about all of the things

22   we were going back and forth on -- but one issue was the prior

23   credit.  And on January 19, 2020, the Government wrote, in an

24   effort to convince Mr. Marques to accept this plea agreement,

25   that "the plea grants him credit for six years spent in Irish

1   custody, credit for which he is not legally entitled under U.S.

2   law or BOP policy."  I am reading their email.

3       They repeatedly told us that this is dead time.  It's

4   gone.  You can't get it back.  So the defense was in a position

5   of having to do one of a few things.  We knew that the count

6   the Government insisted Mr. Marques plead guilty to carried a

7   15-year mandatory minimum.  So we could have made a decision to

8   attempt to negotiate a provision that under 5G1.3 would allow

9   the Court to sentence Mr. Marques to nine years, because then

10  that would take into account quite literally in the plea

11  agreement the six years that he wouldn't receive credit for per

12  the Government's instructions.  There is ample case law on

13  that, that the Court can go below a mandatory minimum under

14  those circumstances if it explicitly references 5G1.3.  That

15  was an option.

16      The other option -- which we knew the Government wouldn't

17  accept, and, in fact, I don't know if we explicitly asked for

18  it, but we knew they wouldn't accept that.

19      So the plea agreement the Government provided to us was

20  what was written, a (C) plea to 15 to 21 years, and the (C)

21  plea paragraph bound this Court to a sentence of 15 to

22  21 years.  The next paragraph bound the parties to what they

23  could argue for in court, 15 to 21 years, and then the next

24  sentence, as has been repeated ad nauseam, I suppose, is that

25  this already takes into account the time spent in Ireland.

1                    THE COURT:  So what do you think that part means?

2                    MR. HURSON:  I think it meant that the Government

3      told us he couldn't get credit for the time.  This was the best

4      deal we could get given that reality, but that still allowed us

5      to come to court and ask for the mandatory minimum up to

6      21 years.  The Government's position was those six years are

7      gone.

8            As evidenced by the Government's ability to get on the

9      phone with the general counsel of the Bureau of Prisons -- and

10     this is a point that was made at the arraignment -- they are

11     far closer to this issue than we are, and, quite frankly, we

12     took that and said this is their position; they are unequivocal

13     in it; they are confident in it.  This is the best deal we

14     could get, 15 to 21 years.

15           This deal did not say 15 to 21 years, and the Court will

16     enter the language that the Government is requesting.  It

17     didn't say that.  It simply said 15 to 21 years.  And then in

18     the paragraph in which the parties would offer to the Court

19     their reasons, it said it takes it into account.  And that was

20     the deal that was signed.  That was the deal that was entered.

21           And today and last week on Wednesday night for the first

22     time the Government filed the opposite position that they had

23     taken throughout the entire negotiation, the positions that

24     were contrary to their emails and conversations with us and

25     that was he is going to get credit.

1          THE COURT:  So you never figured that out on your

2    own?

3          MR. HURSON:  I can't answer that question, Your

4    Honor, because that is a work product --

5          THE COURT:  Okay.

6          MR. HURSON:  -- and that is a conversation with my

7    client --

8          THE COURT:  Fair enough.  Fair enough.

9          MR. HURSON:  And what I can say is that whether I

10   answer that question or not, I am not the Bureau of Prisons,

11   but the person who is closest to the Bureau of Prisons who

12   knows more than we do is the United States Government, and when

13   the United States Government is telling you over and over again

14   you are not getting credit for this time, you accept that, and

15   I don't think there is anything wrong with accepting that.

16         THE COURT:  Okay.  So here's where I am on this case.

17   I think we've talked about this enough.  I am not going to

18   accept the plea agreement.  I'm not accepting this 15 to 21

19   years.  I don't believe that I can make this thing to give

20   another six years -- I'm not going to tell the Bureau of

21   Prisons to not give credit for something that he likely can get

22   credit for.

23       Now, again, the facts could be different, and I don't know

24   what they are, but I'm certainly not in a position to say you

25   should give credit for this or not give credit for this when he

1    may well get credit for it, either because the case law the

2    Government has provided is accurate or because -- I mean, maybe

3    it's possible.  Again, some of these other cases they dig into

4    it and they find that actually there was some sort of foreign

5    sentence that was --

6                    MR. HURSON:  Yeah.

7                    THE COURT:  -- credit for.  I have no idea.

8         So I'm not going to -- the way I see this is basically

9    that, (a), the parties are not where they were at the time.

10   The Government obviously didn't think this is where they would

11   be.  I don't know where the defense was, but they certainly

12   understood -- they either had the same agreement as the

13   Government, that this six years wasn't going to count, or they

14   secretly knew that it was going to count, and they were just

15   hoping that at the very end they could come in and say, ah-hah,

16   it actually should count and, therefore, we actually get six

17   years less than what the Government thought.  Either way it's

18   not a great situation.

19        But the more important thing is if I work under the

20   assumption that this six years is going to get credited, I'm

21   not prepared to extend a sentence of 21 years.  I'm going to

22   sentence higher than that.  So the parties can take that as

23   they will.  Under the agreement, they can start all over again,

24   we can go to trial, whatever you want to do, but I'm not going

25   to sentence between 15 and 21.  I don't agree that 15 years is

1  appropriate.  I'm not sure whether it's more -- I mean, I don't

2  think it's any higher than the 27 the Government has originally

3  expected to get.  It might be less than that, but it's not

4  going to be 21 minus 6 to 15.  That's not going to happen.  I

5  don't have to follow what you all did, even though it's clear

6  neither of you really understood what you were doing.

7        So, (a), I don't agree with the number, and, (b), I

8  certainly think the process was such that I shouldn't defer to

9  the parties' agreement when I'm not sure they really thought it

10  out that carefully.

11        So, I mean, if you want some time to think about it, we

12  can in terms of whether, you know, you want a trial date,

13  whether you want time to negotiate something else, what have

14  you, but I'm not going to accept this plea agreement.  It's too

15  flawed and I also don't agree with the outcome.  So that's

16  where I am.

17              MR. HURSON:  Well, Your Honor --

18              THE COURT:  Among other things, the parties didn't

19  even really agree on the Statement of Facts.  So there is

20  really no reason I should defer to the parties', you know,

21  joint understanding of this; but, more importantly, I don't

22  think the six-year downward departure -- no one has made an

23  argument why that's appropriate other than, perhaps, there was

24  a misunderstanding on the law.  I don't think that's a reason

25  to depart downward.  And nothing in the papers I've seen

1  submitted, although it may justify some kind of departure, it

2  doesn't justify that kind of departure.  So --

3           MR. HURSON:  Well, Your Honor, it is absolutely your

4  courtroom, and I respect your decision.  I do want to say one

5  thing about the Statement of Facts disagreement, specifically

6  that encryption line.  I take full responsibility for that and

7  I apologize.

8           THE COURT:  Okay.  I understand.  I mean, we all make

9  mistakes.  That's not -- I don't have an issue with that.

10     So I don't know.  Do the parties want to think about this?

11  Or how do you want to proceed?

12           MR. HURSON:  Well, I think that our position is that

13  if Your Honor is not going to accept the plea agreement, and I

14  appreciate your, frankly, candid remarks on why, that that

15  provides the parties with a platform to negotiate further, and

16  if we can't get somewhere, then we would ask for some time to

17  set a trial date.  But I will say that there were ample motions

18  filed in this case, some very significant work went into that.

19  Part of the trade off of this plea agreement and part of the

20  acceptance of facts and everything else was because we

21  abandoned that right, and so we would want to necessarily get

22  to that point as well.  So it's more than just trial.

23     But I don't want anything that happened here today -- I

24  take full responsibility for my part in it.  I don't want the

25  Court to feel in any way that Mr. Marques is not accepting

1  responsibility because he is and he tried to, and to the extent

2  that your decision is based in a feeling that he isn't, I don't

3  want you to leave this courtroom feeling that way.

4  THE COURT:  No, it's not that.  Again, it's just that

5  the parties are asking me to depart downward by I think 6 to

6  12 years, and I'm not prepared to do that based upon what I

7  know about the facts and the law.

8  MR. HURSON:  And I understand that, and that is a

9  different issue than accepting responsibility, and I appreciate

10  that.

11  But I would say I would ask the Court for some time to --

12  at least a few weeks to talk with Mr. Marques about this and

13  allow us to update the Court on whether we're able to reach a

14  new agreement or whether we need to set dates for motions

15  hearing and trial.

16  THE COURT:  Okay.

17  Mr. Sullivan, do you agree with that?

18  MR. SULLIVAN:  I think 30 days, Your Honor, if we

19  could have a status conference, perhaps telephonically with the

20  Court to update the Court.  Maybe a week earlier we could

21  provide a status letter updating the Court.

22  THE COURT:  Okay.  Given where we are now --

23  MR. SULLIVAN:  Maybe 45 days would be appropriate.

24  THE COURT:  Well, I mean, the defense has a speedy

25  trial, which we're turning that back on now, although I don't

1  know if the pending motions address that; but as a practical

2  matter, even if the pending motions -- are there still pending

3  motions?  We never --

4          MR. HURSON:  There are motions on file.

5          THE COURT:  Right.  We don't usually deny them until

6  the thing is over but --

7          MR. HURSON:  That's correct.

8          THE COURT:  But even so, I would want the defense to

9  agree that with or without the need to stop the clock that they

10  are okay with however much time.  Is 30 days or 45 days okay

11  for you, Mr. Hurson?

12          MR. HURSON:  Absolutely, Your Honor.

13          THE COURT:  So today is May 12th.  Shall we say

14  June 25th?  And I know this is a very -- June is a very

15  challenging month in terms of having wall to wall trials.  So I

16  would ask, perhaps, the parties to submit a written joint

17  status report.  If there is a need for a conference, we can

18  certainly try to squeeze one in somewhere, but why don't you

19  start with a written status report.

20      What that could mean is either -- well, certainly if there

21  is a different plea, then the parties could just submit that in

22  lieu of the status report whenever it's ready.  If by then

23  there is no agreement, then, perhaps, the status report can

24  say, well, we're not going to be able to reach an agreement;

25  here is the proposed schedule for handling motions and/or

1   trial.

2        As you may know, I don't always schedule the trial until

3   after the motions are resolved, but given the age of the case,

4   you know, with this whole process, I don't want to delay it any

5   further.  So if the parties think that they can map out a

6   motion schedule and then want to have a trial date set just so

7   that everyone's calendars can be set, you can propose that.  Or

8   if you're willing to defer on the trial date -- part of that

9   depends on how long it will be and so forth.  I mean, I think

10  right now I know that the rest of the year looks pretty busy.

11  There is some decent amount of time in early '22 still as of

12  now, depending on what comes up in other cases, of course.

13       So the parties can propose that we either put a date and

14  block a time period off or not.  Either way.  I don't recall

15  what kind of motions we're dealing with and how complicated

16  they would be, but I would suggest that there be a briefing

17  schedule and perhaps telling me what the hearing schedule would

18  be in terms of whether we need a hearing, whether it would be

19  an evidentiary hearing, how long that would take, and,

20  therefore, we could try to find a date for that if it comes to

21  that.  So that's the kind of information to put in the status

22  report if there is no agreement at that point.

23       I will leave open, just as a reminder, that there is no

24  actual requirement that there be a new plea agreement.  The

25  defense does not have to withdraw from the agreement.  I

1   haven't heard them say that they are withdrawing.  They just

2   want to think about it.  So that's another option.

3        Anyway so anything else we should discuss while -- oh, let

4   me -- anything else on any of that?

5             MR. SULLIVAN:  No, Your Honor.

6             MR. HURSON:  No.

7             THE COURT:  Okay.

8        While we're here, though, I was reminded, Mr. Sullivan and

9   Mr. Paradiso, this case started before the Due Process

10  Protection Act, and I want to go over that with you.  As you're

11  aware, that law requires, in addition to the Constitution, that

12  the Government produce in a timely fashion all exculpatory

13  material and that failure to do that could result in exclusion

14  of evidence, adverse jury instructions, dismissal of charges,

15  contempt proceedings, vacating of a conviction, or disciplinary

16  action.  Has the Government complied with that -- is the

17  Government aware of those obligations, and have you complied

18  with that in this case?

19            MR. SULLIVAN:  Yes and yes, Your Honor.

20            THE COURT:  Okay.

21       And could I just ask Mr. Hurson, these documents that I

22  talked about, even though perhaps this is not the full final

23  hearing on the matter, but the documents that we were using as

24  exhibits, can you mark those and just provide copies to the

25  clerk so that we can --

1          MR. HURSON:  I can do it now or I can submit it

2   electronically under seal, which might be the easier thing to

3   do because they are FBI reports.  I could do that within

4   24 hours, whatever the Court --

5          THE COURT:  I think that's fine.  If you would just

6   identify what they were and submit them, that would be helpful.

7          MR. HURSON:  Excellent.

8          THE COURT:  Okay.  So, again, I think the status

9   report -- I think we said June 25th.  Is that correct?

10          MR. SULLIVAN:  That was the date the Court gave, Your

11   Honor.

12          THE COURT:  Okay, great.

13       Thank you all very much.  Have a good rest of the day.

14          THE COURTROOM DEPUTY:  All rise.  This Honorable

15   Court now stands adjourned.

16

17       (The proceedings were adjourned at 11:04 A.M.)

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3       I, Marlene Kerr, Registered Professional Reporter,

4   Certified Realtime Reporter, Registered Merit Reporter, in and

5   for the United States District Court for the District of

6   Maryland, Southern Division, do hereby certify, pursuant to 28

7   U.S.C. § 753, that the foregoing is a true and correct

8   transcript of the stenographically-reported Report of

9   Proceedings held in the above-entitled matter and that the

10  transcript page format is in conformance with the regulations

11  of the Judicial Conference of the United States.

12

13                  Dated this 21st day of May, 2021.

14

15                    _____/s/_____

16                          Marlene Martin-Kerr
                        Federal Official Court Reporter

17

18

19

20

21

22

23

24

25