<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                        SOUTHERN DIVISION

 3   _____
                                    )
 4   UNITED STATES OF AMERICA       )
          v.                        )   Case No. 8:19-cr-00200-TDC-1
 5   ERIC EOIN MARQUES,             )
                      Defendant.    )
 6   _____)

 7                                      Greenbelt, Maryland
                                        September 15, 2021
 8                                      2:07 p.m.

 9
              REARRAIGNMENT AND SENTENCING HEARING
10             BEFORE THE HONORABLE THEODORE D. CHUANG

11                   A P P E A R A N C E S

12   ON BEHALF OF THE GOVERNMENT:

13        OFFICE OF THE UNITED STATES ATTORNEY
          6500 Cherrywood Lane, Suite 200
14        Greenbelt, Maryland  20770
          BY:  THOMAS M. SULLIVAN, ASSISTANT U.S. ATTORNEY
15             (301) 344-0173
               thomas.sullivan@usdoj.gov
16
          U.S. DEPARTMENT OF JUSTICE
17        1301 New York Avenue, 11th Floor
          Washington, D.C.  20530
18        BY:  RALPH PARADISO, TRIAL ATTORNEY
               (202) 514-1793
19             ralph.paradiso@usdoj.gov

20

21                        (Continued)

22

23

24

25
</pre>

1                   A P P E A R A N C E S  (Cont'd)

2    ON BEHALF OF THE DEFENDANT:

3        OFFICE OF THE FEDERAL PUBLIC DEFENDER
         100 S. Charles Street, Tower II, Suite 900
4        Baltimore, Maryland  21201
         (410) 962-3962
5        BY:  BRENDAN A. HURSON, ASSISTANT FEDERAL PUBLIC DEFENDER
                 brendan_hurson@fd.org, ESQUIRE
6                MAGGIE GRACE, ASSISTANT FEDERAL PUBLIC DEFENDER
         BY:  maggie_grace@fd.org

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
                         PATRICIA KLEPP, RMR
24                       Official Court Reporter
                     6500 Cherrywood Lane, Suite 200
25                     Greenbelt, Maryland  20770

```
 1                    P R O C E E D I N G S

 2         (Call to order of the Court.)

 3              THE COURTROOM DEPUTY:  All rise.  The United States

 4    District Court for the District of Maryland is now in session,

 5    the Honorable Theodore D. Chuang presiding.

 6              THE COURT:  Thank you, everyone.  Please be seated.

 7              THE COURTROOM DEPUTY:  The matter now pending before

 8    this Court is Criminal No. TDC-19-0200, United States of America

 9    v. Eric Eoin Marques.  We are here today for the purpose of a

10    rearraignment and sentencing.  Counsel, please identify

11    yourselves for the record.

12              MR. SULLIVAN:  Good afternoon, Your Honor.  Thomas

13    Sullivan for the United States.  Also with me at counsel table

14    is Ralph Paradiso, Trial Attorney with the Child Exploitation

15    and Obscenity Section.

16              THE COURT:  Good morning -- good afternoon.  Thank

17    you.

18              MR. HURSON:  Good afternoon, Your Honor.  Brendan

19    Hurson and Maggie Grace on behalf of Mr. Marques, who is seated

20    to our right.

21              THE COURT:  Okay, good afternoon.  Good afternoon to

22    Mr. Marques.

23         (All responding:  Good afternoon.)

24              THE COURT:  And we are here for sentencing in this

25    case.  Just to start by reviewing with everyone in the courtroom
```

1   our protocols regarding COVID 19, we ask everyone or direct

2   everyone to keep their masks on throughout the proceedings, the

3   one exception being, if counsel or parties are fully vaccinated

4   and can attest to that, then you may remove your mask if you're

5   making any remarks, but put them back on after you finish your

6   remarks.  I will likely remove my mask during some of my

7   remarks.

8           We are here for sentencing in the United States v.

9   Marques.  On February 6, 2020, Mr. Marques pleaded guilty to

10  conspiracy to advertise child pornography, in violation of 18

11  U.S.C., Section 2251 (d)(1)(A) and (e).  We had an initial

12  sentencing hearing on May 12th, 2021, at which I determined that

13  I would not accept the plea agreement under Rule 11(c)(1)(C),

14  and so we are now here for a second sentencing hearing.

15          In addition to all the documents submitted in advance

16  of the May 12th hearing, I have received and reviewed the

17  following additional documents in connection with sentencing:

18  The revised presentence report of July 29, 2021, which is ECF

19  107; the defendant's supplemental sentencing memo, which is ECF

20  112; the government's supplemental sentencing memo, ECF 113; the

21  government's restitution submission with its attachments, which

22  is ECF 109; and the defendant's response to the restitution

23  submission with attachment, which is ECF 111.  Is there anything

24  else that was submitted?

25          MR. SULLIVAN:  Not from the government, Your Honor.

1          MR. HURSON:  No.  Beyond the provisions to the

2   plea agreement, there is nothing else.

3          THE COURT:  Right, the revised plea agreement

4   revisions to it.

5          Okay.  So before we get into the details of it, I

6   wanted to clarify what the parties' view is procedurally about

7   what we need to do under Rule 11(c)(1)(C), since I did not

8   accept the January 2020 plea agreement.  The defendant had the

9   option to withdraw his plea and proceed to trial instead.  As I

10  understood it, no final decision was made on that at that

11  hearing.  I believe the resolution at the time was that the

12  defense would consider the issue and would report back.  And as

13  a result of that, we have the proposed amended or the amended --

14  amendments to the plea agreement.

15         I took that to mean, Mr. Hurson, that your client is

16  not withdrawing his guilty plea, but he does want to proceed

17  with those amendments as part of the plea agreement.  And if

18  that's the case, I wanted to ask what we all think the

19  appropriate procedure is.  I don't believe we need to do an

20  entire Rule 11 colloquy, but there may need to be some inquiry

21  as to whether the defendant is knowingly and voluntarily

22  entering into the amendments.  But I'm open to both sides' views

23  on the issue.

24         MR. HURSON:  That is correct.  We have -- Mr. Marques

25  has signed and reviewed the amended -- I'm calling it the

1  amended plea agreement, so I guess it would be better to call it

2  the amendments to the plea agreement.

3           THE COURT:  I think that's right.

4           MR. HURSON:  And we agreed with Your Honor that the

5  colloquy that was given back when Mr. Marques pled guilty in --

6  as I recall, it was February of 2020.  We don't believe you need

7  to go through all of those questions again.  I think both

8  sides -- we spoke before you came out -- are in agreement that

9  simply affirming that Mr. Marques has reviewed the amendments

10  and is accepting those amendments and has time -- you know,

11  obviously, had time to discuss them with counsel would be

12  sufficient for us.  And I believe I'm speaking for the

13  government as well, but I'll obviously let them do that.

14           MR. SULLIVAN:  Your Honor, the Court -- just to take a

15  step back, the Court's recollection is correct.  There was no

16  decision at the time of the prior sentencing whether the

17  defendant wanted to withdraw his plea.  I think the first

18  question would be just to confirm with the defendant that he

19  in fact does not wish to withdraw his guilty plea.

20           And then, at that point, I believe we can proceed in a

21  modified fashion by just showing the defendant the document --

22  like the Court with do with a plea agreement, that he recognizes

23  the document, he understands the nature and import and the

24  ability to amend an agreement under section 23 -- paragraph 23

25  of the prior plea agreement to know the procedural vehicle and

1    that he is in fact doing that knowingly and voluntarily and

2    understands the consequences of those amendments.

3              THE COURT:  Right, okay.  And that is actually what I

4    had in mind.  And so I think we will have a modified plea

5    colloquy.

6              And with that, I will ask the Clerk to administer an

7    oath to the defendant so we can have that colloquy.

8              THE COURTROOM DEPUTY:  Mr. Marques, would you please

9    stand and please raise your right hand.

10             You do solemnly swear or affirm under the penalties of

11   perjury that the information you are about to give to the Court

12   in the matter now pending before it shall be the truth, the

13   whole truth, and nothing but the truth?

14             THE DEFENDANT:  I do.

15             THE COURTROOM DEPUTY:  You may lower your hand, sir.

16   Please state your full name for the record.

17             THE DEFENDANT:  Eric Eoin Marques.

18             THE COURTROOM DEPUTY:  Thank you, sir.  You may be

19   seated.

20             THE COURT:  Okay.  Mr. Marques, do you understand that

21   you are now under oath and you must answer all questions

22   truthfully?

23             And maybe you can pull the microphone, the top of it,

24   down towards you.

25             THE DEFENDANT:  Yes.

1          THE COURT:  And do you understand that if you answer

2    any questions falsely, your answers could later be used against

3    you in another prosecution for perjury or for making a false

4    statement?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Could you start by telling us how old you

7    are?

8          THE DEFENDANT:  Thirty-six.

9          THE COURT:  I'm sorry?

10          THE DEFENDANT:  Thirty-six.

11          THE COURT:  Okay.  And where were you born?

12          THE DEFENDANT:  New York.

13          THE COURT:  Are you a United States citizen?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And how far did you go in school?

16          THE DEFENDANT:  High school.

17          THE COURT:  Have you been treated recently for any

18    mental illness or addiction to narcotic drugs of any kind?

19          THE DEFENDANT:  No.

20          THE COURT:  Are you today under the influence of any

21    drugs, medications, or alcoholic beverages?

22          THE DEFENDANT:  No.

23          THE COURT:  Is there any reason that you would be

24    unable to understand today's proceedings or to make decisions

25    about your future today?

1          THE DEFENDANT:  No.

2          THE COURT:  If you do not understand a question I ask

3     or do not hear a question I ask, will you let me know?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Now, you are here today with your

6     attorneys, Mr. Hurson and Ms. Grace.  Are you fully satisfied

7     with their advice, representation, and counsel in this case?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And if at any time today you wish to

10    consult with them, please let me know, and I will give that

11    opportunity.  Do you understand that?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Okay.  Now, your attorney has stated that

14    although I did not accept the original plea agreement in this

15    case, which is the January 2020 plea agreement, that you have

16    received advice from them and consulted with them and that you

17    do not wish to withdraw your guilty plea; is that correct?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And is it correct that you have since

20    entered into a document dated June 16, 2021, which we are

21    calling plea agreement amendments -- and I do have a copy here,

22    and it was signed by you, I believe, on what would be --

23    although the pages are not numbered -- the fourth page.  Did you

24    enter into this agreement and sign it?

25         THE DEFENDANT:  Yes.

1      THE COURT:  And do you have a copy with you there?

2      Or can one be provided to him?

3      THE DEFENDANT:  Yes.

4      THE COURT:  Okay.  And that is your signature on the

5  last page; is that correct?

6      THE DEFENDANT:  Yes.

7      THE COURT:  And perhaps I should just ask; Mr. Hurson,

8  I asked you this general question at the last proceeding, but

9  since the last sentencing hearing, have you conveyed all plea

10  offers from the government to your client?

11      MR. HURSON:  Yes.

12      THE COURT:  And Mr. Marques, did you have the

13  opportunity to read this plea agreement amendments document and

14  discuss it thoroughly with your attorneys before you signed it?

15      THE DEFENDANT:  Yes.

16      THE COURT:  And do you understand the terms of this

17  plea agreement amendments?

18      THE DEFENDANT:  Yes.

19      THE COURT:  Now, as I understand it, the

20  plea agreement amendments contain certain changes.  The primary

21  one is that the parties are recommending that the ultimate

22  sentence imposed be between 252 and 324 months of imprisonment,

23  and that this is subject to the same rule as the last

24  plea agreement in which if the Court decides to impose a

25  sentence that's not within that range, you would have the

1    opportunity to withdraw your guilty plea, that there also were

2    some changes to the statement of facts that you agreed to,

3    including the descriptions in paragraphs 4 and 5.

4            4 provides more description of the materials that the

5    FBI seized, and 5 includes changes to the discussion of what you

6    had previously said about money you may have earned from hosting

7    internet hosting services.  Do you understand those changes to

8    the plea agreement?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Do you have any questions about any of

11   those changes to the plea agreement?

12           THE DEFENDANT:  No.

13           THE COURT:  And are you prepared to accept the changes

14   both to the recommended range and to the statement of facts?

15           THE DEFENDANT:  Yes.

16           THE COURT:  And do you attest that the changes to the

17   statement of facts are true and accurate, to the best of your

18   knowledge?

19           THE DEFENDANT:  Yes.

20           THE COURT:  And has anyone made any promises to you or

21   assurances to you, other than what's contained in the

22   plea agreement and the amendments to the plea agreement, to get

23   you to accept these amendments or the full agreement as an --

24   you know, in its entirety?

25           THE DEFENDANT:  No.

```
 1              THE COURT:  Has anyone threatened you or pressured you
 2   in any way to get you to accept these plea agreement amendments?
 3              THE DEFENDANT:  No.
 4              THE COURT:  Do you understand all of the possible
 5   consequences of a guilty plea that I described to you previously
 6   in your plea colloquy and that are set forth in the
 7   plea agreement and the amendments to the plea agreement?
 8              THE DEFENDANT:  Yes.
 9              THE COURT:  And do you agree to proceed based on the
10   plea agreement as it has been amended by this June 16, 2021
11   amendments document?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Is there anything else that the government
14   would suggest that I discuss with Mr. Marques at this time?
15              MR. SULLIVAN:  No, Your Honor.
16              THE COURT:  Mr. Hurson, anything from the defense
17   side?
18              MR. HURSON:  No, Your Honor, I think that's
19   sufficient.  Thank you.
20              THE COURT:  Okay.  I do find that the defendant has
21   knowingly and voluntarily entered into the amendments to the
22   plea agreement and that he therefore has knowingly and
23   voluntarily, based on the prior hearings, pleaded guilty to this
24   offense and is prepared to proceed to sentencing subject to the
25   plea agreement as amended.
```

1          So with that, we'll move into the sentencing

2     proceeding in general.  Mr. Hurson, have you and your client had

3     the opportunity to read and review the revised presentence

4     report?

5          MR. HURSON:  We have.

6          THE COURT:  And do you have any remaining objections

7     to it?

8          MR. HURSON:  We have no remaining objections, thank

9     you.

10          THE COURT:  Now, as I understand it, there were some

11     statements in the objections to the plea agreement about the

12     calculations of the guidelines, whether 5G2.2 or 5G2.1 applied.

13     As I understand it, the parties and Probation have all landed at

14     the spot where everyone is in agreement that the calculations

15     are under 5G2.2 and that the presentence report's

16     recommendations of total offense level of 41, criminal history

17     category I are what both sides agree on here.  Is that correct?

18          MR. SULLIVAN:  That's correct, Your Honor.

19          THE COURT:  And you're in agreement with that,

20     Mr. Hurson?

21          MR. HURSON:  That's correct, Your Honor.

22          THE COURT:  Okay.  So I do accept the

23     plea agreement -- the presentence report's calculations of the

24     guidelines, particularly as they relate to 5G2.2, which are the

25     operative guidelines.  And so the total offense level is 41, the

 1   criminal history category is I., so the guideline range is 324

 2   to 405 months, which, because of the mandatory minimum penalty,

 3   it leads to an effective range of 324 to 360 months.  The

 4   guideline range for supervised release is five years to life,

 5   and there is a mandatory minimum term of supervised release of

 6   five years.  The guideline range for a fine is $25,000 to

 7   $250,000, and the special assessment is $100.

 8           With those calculations, we'll turn to additional

 9   argument on the sentencing.  I will start with the government,

10   then move to the defense, and then, if you would like to, we'll

11   hear from Mr. Marques.

12           Mr. Sullivan.

13           MR. SULLIVAN:  Your Honor, Mr. Paradiso will address

14   the Court.

15           THE COURT:  Terrific.  Mr. Paradiso.

16           MR. PARADISO:  May I take my mask off, Your Honor?

17           THE COURT:  Yes, if you're fully vaccinated.

18           MR. PARADISO:  I am, yes.

19           May I begin?

20           THE COURT:  Yes, go ahead.

21           MR. PARADISO:  Thank you so much, sir.

22           Good afternoon, Your Honor.  Mr. Marques is unlike any

23   defendant this Court has ever seen before.  And I would venture

24   to say probably unlike any other defendant this courthouse has

25   ever seen before.  Mr. Marques created a child pornography

1    community on the dark web.  He created it on Tor, which is an

2    anonymous location where he was able to hide his activities and

3    the activities of his coconspirators from law enforcement.

4            These coconspirators ranged around the world, and they

5    sexually abused and sexually exploited children around the

6    world.  When Mr. Marques was arrested, the agents described him

7    as the largest purveyor of child pornography in the world.  When

8    they looked at his Freedom Hosting server, they found over 200

9    websites that were dedicated to the exploitation of children.

10   Those websites contained images of bestiality, sexual abuse,

11   masturbation, torture, and even defecation on children as young

12   as infants.  Many of the images that the FBI or law enforcement

13   found were ones they had never seen before, before arresting

14   Mr. Marques.

15           The government is asking this Court for a sentence of

16   324 months' imprisonment, along with a lifetime of supervision

17   for a person who has unprecedented -- is unprecedented in this

18   arena.  As one of Mr. Marques' own victims said, is that the

19   pedophile is only given a documented time frame of punishment to

20   serve due to his actions, where I, the victim, am given a

21   lifetime of punishment to serve because of things that are

22   outside of my own fault.  We're only asking for 324 months here.

23           Mr. Marques' crimes span the globe.  He lived in

24   Ireland, his server was in France, and he used a drop box, a

25   mail drop box in Nevada to receive correspondence related to

1    that server.  He did all of that to hide not only his identity

2    but the identity of his coconspirators.  He created this

3    community on Tor to gather all like-minded individuals like

4    himself who were interested in child exploitation and the sexual

5    abuse of children.  These individuals talked about sadomasochism

6    and bestiality.

7            One website, called Hurt to the Core, dealt only with

8    the violent sexual abuse of children.  Another one, called

9    Hoarder's Hell, was a restricted website.  And for you to gain

10   access to that website, you had to produce or provide new child

11   pornography that was not seen before.  And you had to verify --

12   there were strict rules to verify that that was recently

13   produced child pornography.  And when the FBI was able to look

14   at the limited RAM that they found on Mr. Marques' computer,

15   they found that he had been to that site, Hoarder's Hell.

16           The defendant did plead guilty --

17           THE COURT:  Can you just clarify that for a second,

18   because I think --

19           MR. PARADISO:  Yes, Your Honor.

20           THE COURT:  -- not all of us are as tech savvy as we

21   should be for this sort of thing.  You're saying that his -- he

22   was hosting -- through his internet server, he was hosting that

23   website but that he also personally visited it, or that it was

24   hosted somewhere else and he visited it?  Maybe you can clarify

25   on that.

1        MR. PARADISO:  Sure.  So the server -- the website was

2    hosted on the Freedom Hosting server.  So "server" is kind of an

3    ambiguous term.

4        THE COURT:  Right.

5        MR. PARADISO:  It was a -- think of it as a file

6    cabinet, the server itself, and it was hosted in a room which

7    was in France, so it was in another larger computer there.  So

8    Mr. Marques had one file cabinet in there, and other individuals

9    had other file cabinets that were on that server.  Mr. Marques

10    actually went to the website that -- you know, one of the files

11    that was in that server, in that file cabinet, which was

12    Hoarder's Hell; we found evidence and the RAM on his computer

13    that day.  And that's in paragraph 19 in the revised PSR.

14        Does that answer your question, Your Honor?

15        THE COURT:  Well --

16        MR. PARADISO:  Sort of?

17        THE COURT:  -- let me just see.  Hold on a second,

18    here.

19        As the statement of facts reads, Mr. Marques -- it is

20    his -- Freedom Hosting is his server, correct?

21        MR. PARADISO:  Yes, Your Honor.

22        THE COURT:  And so when you're talking about

23    particular sites, such as Hoarder's Hell, is that on his server,

24    or is it someone else's?

25        MR. PARADISO:  No, no, Your -- I'm sorry, Your Honor,

```
1   I misunderstood your question.  Yes, those are on his server.
2   So Hoarder's Hell was a site that was contained on his Freedom
3   Hosting server.
4            THE COURT:  So what you're saying is, the core of this
5   crime is sort of setting up this server that had all the child
6   pornography.  You're saying that not only was that on his
7   server, which I assume to have been the case, but that he
8   personally visited it as well, or what was the point of the last
9   comment about that site?
10           MR. PARADISO:  Yes, Your Honor, he also went to that
11  website himself.
12           THE COURT:  Okay.  I think I understand now.  Go
13  ahead.
14           MR. PARADISO:  Okay, sorry, for a second.
15           So the victimization of these children was recorded by
16  individuals and then shared throughout the world, and
17  Mr. Marques allowed this to occur on his server.  And we know he
18  had contact with individuals who were running these websites on
19  his server because some of that information was found in the RAM
20  on his computer that the government was able to view.
21           Now, Mr. Marques encrypted his servers to make it hard
22  for law enforcement to get into, and he also encrypted his
23  laptop.  So the last time we were here, there was some
24  discussion on what happened with that encryption, but on the
25  date of Mr. Marques' arrest, the government was only able to
```

1   access 3 gigabytes of the RAM on his computers at home.  The

2   other 21 gigabytes was encrypted.  And defense argued, well,

3   that's because the government shut the computer off.  And that's

4   not how it works.

5         So basically, Mr. Marques had 24 gigabytes of RAM.

6   And if you think of it as little partitions, he had unlocked

7   approximately 3 gigabytes of it.  So when the government went in

8   and they went to arrest him, or the Irish authorities went to

9   arrest him, Mr. Marques went to go -- ran to go try and shut off

10  his computer, but they were able stop him.  And in doing so,

11  that 3 gigabytes of RAM remained open, and they were able to

12  then view and extract that information.

13        We were never able to get into the remaining 21

14  gigabytes, and that's always been locked.  So we only were able

15  to see a very slim view of what Mr. Marques did, or his

16  criminality, based on that little review of the 3 gigabytes, but

17  it did show a lot.

18        And we also need to note that when Mr. Marques was

19  released by Irish authorities for one day, he ran to a computer

20  store, bought another computer, and then locked agents out of

21  his server, trying to protect not only himself but the rest of

22  his coconspirators.  So Mr. Marques has shown he has the

23  criminality to do this and that he will continue to do this when

24  he's -- if and when he's ever released.

25        Now, one of the things the defendant argued in his

1    original sentencing memo is, well, Mr. Marques should be given

2    credit because he's never touched any child or sexually abused

3    them.  But that's not how this works.  We don't give an

4    individual credit for a crime they didn't commit.  You know, if

5    someone goes and robs a bank, we don't give them credit because

6    you didn't shoot somebody; you get punished for the crime you

7    committed.

8           And here, Mr. Marques created a community that

9    advertised and distributed child pornography.  And he actually

10   victimized children's works.  The abuser violates that child on

11   one day.  Mr. Marques created a community where these children

12   are abused and violated every day of their lives, and they can't

13   get away from it.

14          Unfortunately, individuals look for these children.

15   They find them.  They send them gifts, and they try to make more

16   photos with them.  It becomes celebrity or something of that

17   nature to these individuals, and their pictures are out there

18   forever.  As one of his own victims says, The abuser stole my

19   childhood, but each defendant who possesses and distributes the

20   pictures of my abuse steal my life.

21          The defendant also averred in his sentencing memo,

22   Well, Mr. Marques hosted a web host service, but he really

23   didn't know as much -- you know, what illegality was going on

24   there.  But those are alternative facts that have no basis in

25   reality or the evidence before this Court.  As noted in the PSR

1    and the plea agreement, Mr. Marques was heavily involved in that

2    community.

3           I have told you what the 3 gigabytes of RAM showed,

4    but in that, we saw that he visited three child pornography

5    sites -- I'm sorry, four child pornography sites.  Only three of

6    those were hosted on Mr. Marques' server, Freedom Hosting:

7    Lolita City, which showed that he had visited that site 400

8    times; we saw that he went to Hoarder's Hell and another one

9    called The Love Zone, which are two restricted sites that

10    require users to distribute child pornography to gain access.

11           And we also know that he went to one that's called

12    Onion Pedo -- which "pedo" usually means "pedophile" -- Video

13    Archive.  This website was not located on Freedom Hosting

14    server, it was located on another server, and we saw that

15    Mr. Marques visited that website 1534 times.  The RAM also

16    showed that Mr. Marques had administrative access to that

17    website; in other words, he was the administrator of this child

18    pornography website.  So he was heavily involved in the child

19    pornography community.

20           Now, we have to look at the history and

21    characteristics of Mr. Marques.  Nothing in his background

22    that's in that PSR explains, or excuses, or mitigates the

23    seriousness of his offense or his crimes.  He had a supportive

24    family growing up.  He lived in his family's home.  There is no

25    allegations or evidence of any abuse against Mr. Marques, and he

1   is a high school graduate.  He's been employed, apparently, from

2   approximately his 17th birthday until his arrest, according his

3   own admissions.  And in the defense sentencing memo, it states

4   that he was employed since he was 17, which is approximately

5   2003, and that he was running web hosting services.

6           Now, there's disagreement, but Mr. Marques' own words

7   to Pretrial Services said he made approximately $30,000 a month

8   within that ten-year time period, which comes to approximately

9   $3.6 million.  Now, it doesn't matter whether or not Mr. Marques

10  made that legitimately or if any of that came from any of the

11  child pornography websites.

12          What we do know is that this was his only employment,

13  and he had to pay for his Freedom Hosting service from

14  somewhere, so he needed money to pay for those servers.

15  Additionally, whether Mr. Marques made that money illegally is

16  irrelevant, because either he made money from exploiting

17  children or he hosted these websites and ran his own website

18  because he enjoyed looking at child pornography himself.

19          We also know --

20          THE COURT:  Are there any facts -- and I really don't

21  want to rehash the whole kerfuffle about the money issue; it

22  seems like the parties have reached an understanding of that

23  with the amendments to the plea agreement.  But there is this

24  question that was asserted by both sides about, Well, was he

25  getting money for the so-called legitimate parts of

1    Freedom Hosting or the illegitimate parts?  Is there anything in

2    the record that tells us what the so-called legitimate parts

3    were, what types of things were there, were they the kind of

4    things that would generate fees or anything like that, or is

5    that just not really part of the record?

6              MR. PARADISO:  It's not part of the record here that

7    I'm aware of, Your Honor.

8              Now, as the government was saying, it doesn't matter

9    where the money went to.  Either Mr. Marques was hosting the

10   child exploitation sites on Freedom Hosting to make money, or he

11   was doing it for his own pleasure and using those sites to help

12   further his own child pornography website, OPVA.

13             Now, the one thing that Mr. Marques does allege is

14   that he has autism, or in the past, it used to be known as

15   Asperger's, but now that is part of the autism spectrum.  He

16   claims that that is a reason that kind of led him down this

17   path.  But the facts show differently.  So Mr. Marques ran a

18   legitimate website, according to the defense, and there was no

19   child pornography that was found on that, so he had the ability

20   to differentiate between right or wrong.

21             Additionally, with autism, it doesn't affect

22   individuals like this.  There are hundreds, thousands, tens of

23   thousands of individuals around the world who have autism, and

24   they're not running child pornography websites or creating

25   anonymous servers to host 200 of them.

1          Individuals on the spectrum are either on the low end,

2    which they have a harder time functioning in society, or on the

3    high end, where they can function in society, but there are

4    certain limitations for them.  For instance, they might have

5    trouble identifying facial expressions, or changes in their

6    schedule will affect them.  They have trouble with social cues.

7    Nothing in that makes it difficult between knowing right or

8    wrong.  And in his own sentencing memo, the defendant noted that

9    individuals with autism do not see the world in grays, they see

10   it in black and white; in other words, they see it in right or

11   wrong.

12          Mr. Marques knew what he was doing was wrong.  That is

13   evidenced by the fact that he encrypted everything, he put it on

14   an anonymous server so it would be hard for law enforcement to

15   find.  He lived in Ireland, had his server in France, had the

16   mail go to the United States, and then had somebody forward that

17   to him so that he couldn't be found.

18          And then, when he was arrested, he tried to shut down

19   his computer so the FBI couldn't get to that RAM -- or I'm

20   sorry, Irish authorities couldn't get to that RAM.  And then the

21   day he was released on bond, he went and bought another server

22   to then go shut individuals out.  So he knew right from wrong.

23   So his autism in no way affects his ability to know right from

24   wrong.

25          According to the defendant's own experts, the only

1    issue he has is with social interactions and becoming focused on

2    things, and in here, that focus is child pornography.

3              Your Honor, conspiracy is a greater harm to society

4    than just an individual crime.  In this instance, Mr. Marques

5    got individuals from around the world together.  They all got

6    together and they sexually exploited children.  They reveled in

7    that sexual exploitation, they talked about it, and they helped

8    each other find new children and to go about abusing those

9    children.  They discussed it, they -- on one post, there was a

10   young child, a toddler, who was tied up and hanging upside down,

11   and the individual's phrasing was, I love to see them when

12   they're tied up.  So they are all talking about this.

13             Though Mr. Marques -- we have no evidence he touched a

14   child, we can show that he continually abused them by creating

15   this server and letting it purvey around the world.  Now, a

16   324-month sentence gives specific and general deterrence to

17   Mr. Marques and to others.  It sends a message that if you

18   engage in this type of activity, no matter where you are in the

19   world, we will find you, we will arrest you, and we will put you

20   in jail for a very long time; you will not escape justice.

21             Mr. Marques didn't just simply download and look at

22   child pornography; he created the community for them all to

23   gather, he made it anonymous so that they could hide from law

24   enforcement, and he made it easier for them to do this.

25             Given Mr. Marques' skills and his intelligence, this

1    is not a crime that he's going to age out of.  In fact, as he

2    grows older, he'll get better at it, because he will learn new

3    ways to hide from law enforcement and hide himself in the web.

4    Additionally, it's a crime he could commit from anywhere in the

5    world; he was in Ireland when he committed this crime here in

6    Maryland.  So he can do this wherever he goes.  A 324-month

7    sentence protects the children that he previously abused and any

8    future children that may be abused because of what Mr. Marques

9    does.

10          Your Honor, there is no other defendant like

11    Mr. Marques.  There is no sentence disparity here.  Mr. Marques

12    stands in a league of his own.  He victimizes children around

13    the world, and he needs to be punished and sentenced according

14    to that.  A 324-month sentence in this case with a lifetime of

15    supervision protects the children he's previously abused and

16    protects future children from any further abuse.  It also sends

17    a message to anyone else in the community, the child pornography

18    community, that if you do this, we will arrest you and we will

19    put you away so that you cannot not harm anyone else again for a

20    very, very long time.

21          Thank you.

22          THE COURT:  Can I ask a couple questions.

23          MR. PARADISO:  Sure.

24          THE COURT:  First off, I notice there is an agreement

25    now among the parties for a total of $87,000 of restitution, and

```
 1   I saw in the papers that there is an agreement to have some of
 2   the forfeited money go to restitution.  And my question is
 3   whether that can just happen.  Does there need to be some sort
 4   of court order or part of the judgment that says that that's
 5   what will happen?  I'm always a little troubled by this whole
 6   interplay between forfeiture and restitution, and a lot of it's
 7   in the hands of the government.  If someone can clarify what
 8   needs to happen to make that happen.
 9              MR. SULLIVAN:  Sure, Your Honor.  The process of
10   remission, the transfer of forfeited money to a victim is by
11   statute and by regulation.  That is done by the Department of
12   Justice.  The Attorney General can delegate that to the Asset
13   Forfeiture Section at Main Justice.  The United States Attorney
14   and the United States Attorney's Office does not have any --
15   cannot guarantee that.  We can make the application in our
16   plea agreement, we have agreed to do that, but it is up to the
17   department to actually perform that process.
18              So we have done everything that we can to this point.
19   Upon receipt of the judgment, we will recommend again that this
20   money be directed to the victims, but it is a process that is
21   outside of my office's control.
22              THE COURT:  What happens to the rest of the money if
23   it doesn't go to restitution?
24              MR. SULLIVAN:  The rest of the money would go -- would
25   be forfeited.
```

1          THE COURT:  To where?

2          MR. SULLIVAN:  To the government.

3          THE COURT:  But as a practical matter, which agency

4   gets it?

5          MR. SULLIVAN:  That would be the Treasury.

6          MR. PARADISO:  Your Honor, if I may, I believe it goes

7   to the General Fund, but I can find that answer out for Your

8   Honor.

9          THE COURT:  So it sounds like you're not asking for

10  and don't think it's necessary to have an order or part of the

11  judgment saying anything like that, but at the same time, you're

12  not able to guarantee that's what will happen.

13         MR. SULLIVAN:  That's correct, I'm not able to

14  guarantee that, because there -- by statute, I cannot -- there

15  is no guarantee.  I can make that request, and it's solely

16  within the Attorney General's discretion whether to do that.

17         THE COURT:  Why can't the Attorney General agree to

18  that?  You are all one department.  You know, I'm just saying,

19  have you asked anyone in the relevant office to say, Can you all

20  commit to doing this?  It's your choice.  But they can choose to

21  do so, right?

22         MR. SULLIVAN:  We have not, Your Honor, because

23  typically, what they want is, they want the judgment, and then

24  we provide information, and then they conduct their analysis.

25  They're not going to do, If this happens, then we're going to

1   say yes or no.  So they need a final judgment, we submit that to

2   them, with what other information they request, and then they

3   will make that determination.

4           THE COURT:  So given that all this money's going away

5   from the defendant anyways, why was there no effort or does not

6   appear to have been an effort to have all of it apply to

7   restitution?

8           MR. SULLIVAN:  We have --

9           THE COURT:  I mean, otherwise, it's just going to the

10  Treasury.  Like, it's not helping Mr. Marques anymore.

11          MR. SULLIVAN:  We have seized the two accounts that we

12  have authority to seize, and then we have allocated that towards

13  restitution that has been requested, so ...

14          THE COURT:  Okay.

15          MR. SULLIVAN:  We don't have specific authority under

16  forfeiture to just do what we want with it, so we're able -- the

17  forfeiture allows us to seize it, and then what happens to that

18  is the subject of --

19          THE COURT:  How long does it take for that process to

20  play out?

21          MR. SULLIVAN:  Your Honor, I can't give a guess as to

22  how long that's going to take.  It depends on the Asset

23  Forfeiture Money Laundering Section.

24          THE COURT:  You know, it's pretty common in our cases

25  in this court for the prosecutors to say that it's the Asset

1  Forfeiture Section, I don't know what -- I mean, this is all one

2  government.  Again, it should be knowable.  Is there any reason

3  why, whether as part of the judgment or as a separate order, I

4  couldn't order the government to provide a report on what has

5  happened to that money, let's say within 30 days of the

6  judgment; is there any problem with that?

7           MR. SULLIVAN:  As I stand here, Your Honor, I don't

8  see any separation of powers issue with requesting a report on

9  that.  I think if the Court were to direct that the money go a

10  certain place, I think that would be problematic.

11           THE COURT:  What about a recommendation?  We do

12  recommendations all the time on calculations -- in fact, we

13  might do that in this case as well -- to the Executive Branch.

14  So -- I guess, my question is, if I think that's important, is

15  there any way for me to convey that to the government, other

16  than just saying, Trust me, I will tell them, even though I

17  don't control that office?

18           MR. SULLIVAN:  When you say the government, you mean

19  to Main Justice?

20           THE COURT:  Yes.

21           MR. SULLIVAN:  A recommendation would seem to be

22  something that would be within the Court's discretion and

23  authority, and it sends a message to the department.  But we

24  would be doing that -- we're doing that anyway, consistent with

25  our obligations under the plea agreement, but I don't see any

1    bar to the Court making that recommendation in a judgment.

2            THE COURT:  Okay.  My other question is about

3    supervised release.  The government's asking for lifetime

4    supervision, but it has agreed to have Mr. Marques return to

5    Ireland right after his sentence; is that -- after his

6    imprisonment; is that correct?

7            MR. PARADISO:  We have -- forgive me, Your Honor.

8            THE COURT:  I guess my question is -- assuming that's

9    correct, my question is, as a practical matter, will any of the

10   conditions of supervision either apply, or if they -- or have

11   any enforcement mechanism in Ireland, or is it really just an

12   academic exercise to say, well, this is lifetime supervision,

13   but frankly, when he goes home, he's on his own, we're out of

14   it.

15           MR. PARADISO:  Yes, Your Honor.  So we have agreed to

16   allow for conditions that allow him -- permit him to go back to

17   Ireland if he so chooses.  He can remain here in the

18   United States if he wanted to, or let's say he's released from

19   jail after however many months or years the Court sentences him.

20   He goes back to Ireland for a couple days and then he returns

21   back to the United States.  If the Court does not impose any

22   supervised conditions, once he comes back to the United States,

23   nothing will apply.  So normally --

24           THE COURT:  Wait, hold on a second.  You're saying

25   that if he leaves and then comes back, supervision doesn't kick

1    back in?

2            MR. PARADISO:  Yes, Your Honor, we would want it to

3    kick back in.  I don't know if Your Honor was talking about not

4    giving him supervision or -- but that's --

5            THE COURT:  Well, again, it was just confusing to me,

6    because you're pushing for lifetime supervision, which is a

7    pretty serious sanction --

8            MR. PARADISO:  Yes.

9            THE COURT:  -- but you've agreed to let him go back to

10   Ireland.  So if he goes back to Ireland, my question is, there's

11   a long list of conditions you're asking me -- or at least

12   Probation has recommended to have imposed, and the question is,

13   if he chooses to remain in Ireland, which I think is the

14   assumption here, will any of these either (a) actually apply

15   legally, and then (b) is there any enforcement mechanism -- is

16   anybody in Ireland going to be tracking whether he's complying

17   or not, or is that really just kind of outside of anyone's

18   authority at that point?

19           So whether or not he submits his computers to a search

20   or agrees to allow probation officers to conduct unannounced

21   searches of his computers, none of that will actually apply

22   anymore once he leaves the country?  I'm just trying to

23   understand what the government is recommending by saying, We're

24   recommending this lifetime supervision with these conditions,

25   but he also gets to go back to Ireland.

1          MR. PARADISO:  Yes, Your Honor.  So the United States

2    has not agreed for Mr. Marques to go back to Ireland.  What we

3    have agreed to is supervised release conditions that may permit

4    him to do so if, you know, he chooses.  He's a dual national.

5    So he could stay in the United States; there's nothing saying he

6    has to go back to Ireland.  So --

7          THE COURT:  So when you're on supervision, if

8    you're -- if there's not an international border, as you know,

9    you're on supervision, it's a requirement, it's part of the

10   sentence, you are released, perhaps, to where you came from

11   originally, what state, and if it's the state of conviction,

12   which in this case is Maryland, then our Maryland

13   Probation Office, U.S. Probation Office in Maryland will

14   supervise.

15         But if you decide going live in some other part of the

16   country, jurisdiction gets transferred to that district, but

17   there's still the same supervision that's occurring here.  I

18   don't think -- I'm not familiar with whether that can happen if

19   someone goes back to another country.

20         I also do not know whether -- I mean, you -- I guess

21   what I don't understand is, when you are saying, We didn't agree

22   to let him go back to Ireland, but the first proposed condition

23   of supervision is, The defendant shall be permitted to depart

24   and reside in Ireland immediately.  So once you do that, I'm

25   asking, legally, is there any actual supervision, is he still

1    even on supervised release, or is he just kind of on his own?

2            And the only equivalent I can think of is when someone

3    gets deported when they're on supervision, and my understanding

4    is, when they're deported, U.S. Probation has nothing to do with

5    them, and there's no deal with the foreign country to have

6    something to do with them, and so the only sanction is, if they

7    choose to come back, then it would kick back in.

8            MR. PARADISO:  Yes, Your Honor.

9            THE COURT:  Is that all we're talking about here?

10           MR. PARADISO:  That's all we're talking about, yes,

11   Your Honor.

12           THE COURT:  Okay.  So all these things that are

13   important safeguards in these kinds of cases that you want for

14   his lifetime about searching computers, monitoring his

15   conditions, et cetera, all of these are things that --

16           MR. PARADISO:  Yes, Your Honor.  I can't speak if the

17   courts in Ireland or the equivalent of a Probation Office in

18   Ireland would look at those and put them in effect.  I don't

19   have that knowledge of how they will work.  It all depends on,

20   you know, whether or not Mr. Marques goes back and what -- how

21   they view things.  That -- that is beyond my knowledge,

22   Your Honor.  I apologize.

23           THE COURT:  But is it part of your recommendation --

24   again, I'm looking at the PSR, which -- are you or are you not

25   recommending him being allowed to depart immediately upon

```
 1    release from prison, as part of the plea agreement or otherwise?

 2              MR. SULLIVAN:  Your Honor, if I can just have a minute

 3    with counsel.

 4         (Conference between Mr. Sullivan and Mr. Paradiso.)

 5              MR. PARADISO:  Yeah.  Your Honor, there's nothing the

 6    government can do to keep him in the country.  I mean, it's --

 7    if he's free from prison, he's allowed to leave.  We haven't

 8    agreed to, you know, him going back to Ireland, but there's

 9    nothing we can do to stop him.  He's a dual national citizen, so

10    he could go back to Ireland.

11              THE COURT:  I'm just going back to the plea agreement,

12    here, just to make sure I understand what you all agreed to.

13              MR. HURSON:  Your Honor --

14              THE COURT:  I guess -- before I get to you,

15    Mr. Hurson -- because I'll give you a chance.

16              I mean, I don't know if that's entirely accurate, or

17    maybe your point is, there's nothing we can do short of

18    increasing the length of the sentence to keep him here any

19    longer, but the plea agreement -- and this is the original

20    plea agreement, I think -- states, The parties agree to jointly

21    recommend a condition of supervised release, permitting

22    defendant to depart the United States to reside in Ireland

23    immediately upon the completion of any term of imprisonment.

24    So --

25              MR. PARADISO:  Yes, Your Honor.
```

```
 1              THE COURT:  -- I guess when I asked you if the
 2    government agreed to that, why couldn't you just say yes, as
 3    opposed to saying, well, you know, we couldn't stop it.  I mean,
 4    why don't you own the agreement that you've entered on behalf of
 5    the government?  It seems like you're trying to deflect and stay
 6    away from that.  I mean, you signed the agreement.  Are you
 7    reneging on the plea agreement?  I guess I'm not sure what
 8    you're saying.
 9              MR. PARADISO:  With all due respect, Your Honor, we do
10    stand by the agreement and what we said.  Your question to me
11    was, the government has agreed for him to return to Ireland, and
12    that's not technically what we've done.  If he wants to return,
13    he can return.  If he chooses not to return, he chooses not to
14    return.
15              THE COURT:  Okay.  We're getting into semantics, here.
16    I mean, you and I know very well he's not planning to stay here
17    under these conditions.  And it's kind of insulting to someone's
18    intelligence to suggest that that's anything else.
19              Why don't we -- but the question I had was -- and it
20    sounds like you've answered it -- is that it's clear from the
21    plea agreement that you have agreed to the recommendation that
22    he be allowed to return, that's what Probation has listed, the
23    point being, though, there's nothing that kicks in, in Ireland,
24    that imposes any kind of supervision over him, either by treaty,
25    by operation of -- and there's really nothing, correct?
```

 1            MR. PARADISO:  Not that I'm aware of, Your Honor.

 2            THE COURT:  Okay.

 3            Okay.  Mr. Hurson.  And I know you wanted to address

 4   some of the issues that came up in the discussion with the

 5   government, but --

 6            MR. HURSON:  Yeah.  I don't know if it would be better

 7   to start there or to --

 8            THE COURT:  Okay.  We'll do that, and then we'll move

 9   to any general argument you may have.

10            MR. HURSON:  Two things that -- to work with the

11   supervision.  It was absolutely our intention, when entering

12   into this agreement, that as soon as Mr. Marques finishes his

13   federal prison sentence, he will leave the United States.  As

14   Your Honor is aware, one of the conditions of supervision is,

15   traditionally, you may not leave the district without the

16   permission of the probation officer.  So obviously, though the

17   government said he can go, that's not true.  So our

18   understanding --

19            THE COURT:  Right, but just hold on a second, just on

20   that point.

21            MR. HURSON:  Certainly.

22            THE COURT:  What you're saying is that in general, a

23   court can impose, as a condition of supervision, that the

24   defendant remain in the district or have travel restricted to

25   certain states.

```
 1              MR. HURSON:  That's correct.
 2              THE COURT:  And that kicks in regardless of their
 3    legal status.  I mean, there might be some question if they were
 4    actually not legally permitted to be in the United States,
 5    whether that runs cross-purposes.  But if someone's a U.S.
 6    citizen, why couldn't a court say, you know, at least for the
 7    first year or two, we want to keep an eye on you, we're going to
 8    keep you in this state, unless you ask for permission?  I know
 9    you've agreed to something different, but --
10              MR. HURSON:  Yeah.  To be honest, I think -- and I
11    always try to be -- I think that you're right; I think a court
12    might be able to do that to a citizen.  I mean, they can
13    certainly -- the Court certainly has the power to compel a
14    citizen to remain in Maryland when they may want to go to
15    Florida.  So I think it's possible.  And when we entered into
16    this agreement, we had that sort of understanding in mind, that
17    that could be something that could happen, and we wanted to head
18    off opposition to that, opposition to returning.
19              I know in the illegal reentry context, the guidelines
20    actually speak to this, and they talk about sort of eliminating
21    supervision entirely for certain offenses if the individual is
22    leaving.  That was not something we could agree on.
23              I do want to say one thing that was bantered around
24    with respect to what are the obligations in Ireland.  We address
25    this a little bit on page 32 of our initial sentencing memo.
```

1    The Irish government does have the Sex Offenders Act of 2001,

2    which we believe, and the government has never said otherwise,

3    would apply to Mr. Marques when he returns to Ireland.  That

4    would require him to immediately register with the Gardaí, the

5    local authorities, and he would be subject to a fairly robust

6    set of standard conditions and essentially mimicking supervised

7    release.

8            But to answer your specific question, I don't believe

9    that the treaties between the United States and Ireland with

10   respect to -- apply to anything more than extradition.  So I

11   don't think, for example, if you -- and I'm not asking for

12   this -- if the Court imposed a specific condition of a polygraph

13   or something like that, which we of course oppose that, but

14   either way, that that would necessarily be something the Irish

15   government, by treaty or obligation, would have to do.

16           However, I do know that the Irish government will be

17   monitoring him by law.  And if he were to fail to register, if

18   he were to fail to follow the requirements of the Irish

19   government, he would be committing an offense against the

20   government of Ireland.  So there is a statutory scheme in place

21   in the country of Ireland that will require him to be under some

22   level of monitoring.  And in fact, even if he leaves Ireland and

23   returns, he has to reregister.  So it mimics in some ways what

24   we have here in the United States.  So I --

25           THE COURT:  But that's more like a SORNA thing, not

```
 1    anything specific, right?
 2              MR. HURSON:  Exactly.  It is a -- that's right.  I
 3    don't -- I will tell you, I don't know -- if you ordered in his,
 4    you know, conditions that he needed to read a particular book
 5    or -- I'm coming up with just sort of an example -- I don't know
 6    that his failure to do that in Ireland would generate any
 7    meaningful sanction, but what I can say with 100 percent
 8    certainty, and having confirmed this, both through reading the
 9    law and speaking to officials there, it's not as though when
10    hits Dublin, he will not be supervised; that's just not the
11    case.  The judgment in this country will follow him.
12              THE COURT:  But the specific terms will not --
13              MR. HURSON:  I think that's -- I --
14              THE COURT:  -- on supervision; whatever they choose to
15    care about, they will care about, or what their statutes
16    requires them to --
17              MR. HURSON:  I'm looking at Ms. Grace because we
18    didn't get a chance to talk about this, but that's my
19    understanding of it.  I do not believe -- now, I will say, they
20    can call the United States, they can ask for what they normally
21    do and how they would do it and perhaps take advisement, but I'm
22    not aware of any legal requirement that the government of
23    Ireland impose the same conditions.  I hope that answers the
24    question.
25              With respect to the restitution, I did -- the process
```

1    of applying forfeited funds to restitution is admittedly more

2    complicated than it should be.  I asked the government in 2020

3    if they could make what's called sort of a preliminary request

4    of the MLARS, the agency within the Department of Justice that

5    handles that.  I did not hear back as to whether they made that

6    preliminary request.  But you can, as the United States

7    government, a U.S. Attorney's Office can begin that process of

8    transferring that money to victims.

9            That's what we want to have happen.  We want that

10   money to get into the hands of the victims.  In fact, just this

11   morning, we received an e-mail, both parties, from your

12   courtroom assistant, asking for the names and addresses.  We

13   responded with the names and addresses of all the victims.

14           THE COURT:  Well, obviously, because otherwise, he's

15   on the hook for the money.

16           MR. HURSON:  Well, he's on the hook for the money, but

17   we're trying to make sure it gets where it's supposed to go.

18   And so we're not trying to stand in the way of that process.

19           THE COURT:  No, I understand that.  You have an

20   incentive to do that.

21           MR. HURSON:  Because the government is correct that --

22   that the -- it is a different part of the government, so to

23   speak, but I have had prosecutors assure us that if they make

24   the request, that it is almost a certainty that it will happen,

25   that that money will be moved and then will ultimately end up in

1  the hands of the victims vis-à-vis their respective

2  representatives.

3          So I see no objection and in fact would support -- I

4  don't believe it would be a breach of the plea agreement in any

5  way to ask the Court to request an update on that process and

6  make it clear in the judgment that all parties, the defense and

7  the government, are here asking for that forfeited money to be

8  applied to restitution as swiftly as possible.

9          THE COURT:  Okay.  No, I agree with that, and I think

10  whether it's in the order of forfeiture itself or in the part of

11  the judgment where we reference the order of forfeiture, I think

12  I will recommend that that occur.  And I might separately ask

13  for a report, because the government was a little less certain

14  than you are that it's almost certain in this case that that

15  would happen, they seem to be not even willing to go that far,

16  and so --

17          MR. HURSON:  No, and I respect that.

18          THE COURT:  And just as a practical matter, it's a lot

19  of offices, and each case may be important to us or even to our

20  prosecutors.  They may not be as important or as noticeable to

21  the people in these other offices, so I think there's always the

22  risk that some of this kind of gets lost in the shuffle.

23          MR. HURSON:  No, I respect -- and it is an issue that

24  comes up in all sorts of cases, and it's something that is

25  unfortunately difficult.  And I don't mean to imply that they're

1   playing some sort of game here.

2           THE COURT:  No, I'm not either, I'm not either.

3           MR. HURSON:  I think we're all in agreement that it

4   needs to get to the victims, and we'll work with them in any way

5   we can to make it happen.

6           With respect to 3553(a), I mean, I stand here asking

7   for and requesting that -- a sentence of 21 years, which would

8   be 252 months.  There is absolutely no dispute that the images

9   and the videos that were housed on the Freedom Hosting server

10  are abhorrent.  We agree.  And there is no dispute that

11  Mr. Marques is responsible for maintaining that server, which

12  allowed other people around the world, his coconspirators, if

13  you will, to host websites there.  And we agree that -- the

14  evidence that the government noted before, that he had actually

15  visited some of those sites.

16          Mr. Marques' crime was running the server on which

17  other people hosted websites, and he also visited some of those

18  websites.  That is -- that is what he admitted to, and that is

19  what he did.  And over the course of the time that he has been

20  incarcerated, which has now been some two -- almost two and a

21  half years with Ms. Grace and I., we have spent a significant

22  amount of time with him.  We have reviewed all the victim impact

23  statements with him, we have reviewed the restitution requests

24  with him, and we have discussed his conduct, and I can tell you,

25  unequivocally that he is remorseful for what he did in this

1    case.

2              He knows what he did was wrong, and he stands before

3    you, recognizing that he has caused pain to the victims, some of

4    which you've read about in the request for restitution and

5    victim impact statements and some of which you haven't.  And

6    he's also remorseful for the pain and shame that this has

7    brought on his family in Ireland.  He recognizes what he did.

8              And that is why we had come here agreeing to a very

9    significant jail sentence, a sentence to of 21 to 27 years.  And

10   these are numbers that are essentially on par with taking a

11   life, in some courts.  These are very big numbers, and I don't

12   think anyone disputes that.  And Mr. Marques does not dispute

13   that such a sentence is warranted, a high sentence.

14             You know, he -- I think the way that I would frame the

15   discussion with respect to 3553(a) is, using the language of

16   3553(a), which is, the sentence must be sufficient, but not more

17   than necessary, and then reframing it slightly differently, is,

18   what can -- what does 27 years accomplish that 21 doesn't?  And

19   we know literally, it keeps Mr. Marques in jail longer; I know

20   that, I'm not blind to that.

21             But through the lens of whether 21 years would be

22   sufficient, I would offer that both sentences, the one I'm

23   asking for and one they're asking for, does send the message to

24   the world that this conduct will not be tolerated in the United

25   States.  It sends the very message the government said, that you

1    can be found, and you will be brought here, no matter where you

2    are, and you will be prosecuted.

3         Mr. Marques' extradition and prosecution in this

4    country alone stand for that proposition.  And this is a very

5    long sentence with what, domestically, but internationally, is a

6    jaw-dropping number, 21 to 27, particularly in Europe, is an

7    extremely long sentence, regardless of what it is.  So that

8    message will be conveyed, even with a 21-year sentence.  Both

9    sentences leave Mr. Marques imprisoned in the United States for

10   a significant period of time, decades, without visits from his

11   family.  Both sentences have had him here at our Chesapeake

12   Detention Facility, where he spent two and a half years.

13        And I'd say -- I mentioned this a little bit in our

14   supplemental memorandum -- those have been hard years, for him

15   and for everyone.  I'm not in any way trying to say that the

16   restrictions for COVID are somehow unique to him, but I think

17   it's important to put it in context, that what that means, being

18   on lockdown at the Chesapeake Detention Facility, means that for

19   the last two and a half years, Mr. Marques had not seen a tree,

20   he has not walked on grass, he has not had the sun on his face.

21        And I know that there are people who would say, good,

22   he deserves it, that's exactly what somebody who did what he did

23   deserved.  And I'm not really here debating that; I'm just

24   saying that that's harsh confinement, and that is something he

25   has endured now for two and a half years.

 1          And given his condition, which the government touched

 2   on, and I will too, that is significant.  He is down in a

 3   protective custody unit, essentially by himself.  He does have

 4   phone contact with his father and occasional -- when they had

 5   video visits, he would have that, but he's never had an

 6   in-person visit or any visit, even through glass, with anyone

 7   other than Ms. Grace and I.  So this has been an isolating time

 8   for him, and it will continue to be, when he's in the custody of

 9   the Bureau of Prisons.

10          Both sentences leave him essentially marked for life

11   and his family marked for life as a sex offender.  His family

12   now reports essentially being pariahs in their own land, at

13   times, you know, worried about being recognized.  This case has

14   gotten some coverage there.  And so when Mr. Marques returns to

15   Ireland, it will not be under any sort of cloak of anonymity.

16   Quite the opposite; people know who he is.  And he will be a

17   monitored sex offender when he returns to Ireland.  And that

18   will happen no matter what sentence you give.

19          Either sentence will put Mr. Marques in custody such

20   that he can receive some level of counseling.  There was some

21   back and forth.  We had filed a sentencing memo describing the

22   sort of lack of mental health care at CDF.  That will improve

23   slightly when he gets placed at a BOP facility.  But I do want

24   to make clear that -- and we will request that Mr. Marques be

25   recommended to enroll in a sex offender management program

 1    within the Bureau of Prisons, but that program will only begin

 2    in the final three years of his sentence.  Those programs are

 3    not programs that continue throughout the duration of your time.

 4            So he will essentially receive the same amount of

 5    care, mental health care, if he receives a 21-year sentence or a

 6    27-year sentence.  And in fact, if he were to receive a 21-year

 7    sentence and return to Ireland, as we hope, he would be in a

 8    position to receive more counseling and more care, which his

 9    family is prepared to provide for him.  And when I talk about

10    the counseling and care, I'm speaking of some of the types of

11    programming that Dr. James addressed in her attachment to our

12    sentencing memo.

13            Those types of programs unfortunately are not

14    available in the Bureau of Prisons.  They do not have a special

15    program designed for people with ASD.  That's unfortunate,

16    because there is an unfortunately abnormally high, I guess you

17    would call it, disproportionately high number of people on the

18    autism spectrum who do end up in these types of cases.  And

19    you know it because you have seen it yourself.

20            Unfortunately, the Bureau of Prisons doesn't

21    necessarily tailor its treatment to that condition, but we are

22    very hopeful, when he returns to Ireland, that his family -- and

23    I can tell you, his father has already reached out to numerous

24    practitioners in Ireland, to try to make those inroads, so that

25    when Mr. Marques comes home, he can receive the type of

```
 1   counseling and care that Dr. James recommends that he will.

 2         And I would tell you that, you know, his behavior -- I

 3   am not trying to use autism spectrum disorder as a

 4   get-out-of-jail-free card or to offer it up as an excuse for

 5   everything that happened here.  I do in that sense agree with

 6   the government that not everyone who is on the autism spectrum

 7   finds themselves in a federal criminal courtroom or engages in

 8   this type of activity.

 9         But we know that that is a disability that has, as a

10   hallmark, a weakness in social cognition.  Adaptive functioning

11   is one of Mr. Marques' extreme weaknesses.  And as Dr. James

12   noted, social perspective-taking, understanding the emotional

13   and social implications of his behavior, that is a problem for

14   Mr. Marques.  It is a deficit for him.  And he, as we see

15   throughout his entire life, from the earliest stages, was

16   different.  He was a loner.  He was often bullied, ostracized,

17   spent most of his time obsessed with technology, taking apart

18   radios and putting them back together.  Always alone.

19         We speak to his family and friends -- family and their

20   friends in Ireland, and everyone describes from early age that

21   Mr. Marques was always on his own.  And that unfortunately did

22   lead him to the internet.  And that is not uncommon; you do see

23   that often folks suffering from what Mr. Marques has do find

24   some of the community that they do not have on the -- in the

25   real world on the internet.  And that is what happened here.
```

1          And the government is correct, that from 17 years of

2   age, Mr. Marques began running hosting services in Ireland.  And

3   those were legitimate hosting services.  There was so much about

4   this the last time -- and I thought we had cleared it up, and

5   I think we have -- that he ran a company called Host Ultra in

6   Ireland, which was essentially a web hosting service for all

7   sorts of -- anybody could sign up, and it was totally

8   aboveboard, and he was compensated for it.

9          In 2008, while simultaneously running Host Ultra and

10  making money from that, that's when Freedom Hosting was started.

11  And from 2008 until 2013, Freedom Hosting did provide Tor

12  network hosting services for a variety of websites, and you have

13  heard about some of those websites today.

14          THE COURT:  So just to clarify --

15          MR. HURSON:  Certainly.

16          THE COURT:  -- and I always try to keep the government

17  to the record, so I'll ask you to stay within it too as much as

18  you can.

19          MR. HURSON:  Sure.

20          THE COURT:  But for context, you've now used this

21  term, "Host Ultra," which I don't know if I've focused on

22  before, but it does seem as if you -- you know, tried to make

23  the point, there's the legitimate part, the illegitimate part,

24  the legitimate part is where all the money was made.  But is the

25  government correct that this legitimate part was sort of even

1   technologically different; it wasn't on Tor, it was --

2          MR. HURSON:  That's correct, that's right.

3          THE COURT:  -- sort of in a normal place on the

4   internet.

5          MR. HURSON:  That's correct.

6          THE COURT:  And is Freedom Hosting the term we use for

7   everything or just the part that was on Tor?

8          MR. HURSON:  The -- Freedom Hosting was, quite

9   literally, the name of the Tor hosting service.  And Freedom

10  Hosting had -- the government is correct, the server was located

11  in France, and Freedom Hosting was the free dark web hosting

12  service that Mr. Marques has admitted to running.  And it was on

13  Freedom Hosting that the horrific websites that the government

14  describes were hosted.

15         THE COURT:  So you would agree that that's a different

16  server or a different area in cyberspace than Host Ultra --

17         MR. HURSON:  Yes.

18         THE COURT:  But you would say that --

19         MR. HURSON:  Yes.

20         THE COURT:  -- at least -- you're saying the

21  government hasn't proven that the money that he made came from

22  the Freedom Ultra Tor side of the house --

23         MR. HURSON:  Freedom --

24         THE COURT:  But they are separate; you're just

25  saying --

1            MR. HURSON:  That's correct.

2            THE COURT:  Your position is, they -- either the money

3    was made only on the legitimate side, or at least the government

4    hasn't shown otherwise.

5            MR. HURSON:  That is absolutely correct.  And we

6    received, as you can imagine, terabytes of data on this case,

7    including bank account records and everything else.  And that's

8    what we provided, and that's what the PSR has been updated to

9    reflect, that Mr. Marques' money came from his legitimate

10   hosting services.

11           But I do agree with the government that that,

12   obviously -- much like someone who operates a bar and then, in

13   the back, is selling narcotics, the bar is -- the money, it is

14   facilitating; that's why we've agreed to an order of forfeiture

15   of money, because that money, even if it was made legitimately,

16   helped to -- Mr. Marques to defray some of the costs of running

17   what was the free service, Freedom Hosting.

18           So again, it does not change the fact that Mr. Marques

19   is the host, that he ran that server, but I think it is -- it

20   was important the last time, it was an issue that came up as to

21   where the money came from, and I believe that that issue has

22   been addressed, that that money did come from his legitimate

23   business, but it did certainly help to facilitate his

24   Illegitimate business.

25           The -- you know, these cases obviously generate, and

1    rightfully so, revulsion, and they should; I mean, these are

2    horrible cases.  And I recognize that these feelings are

3    completely justified, but I also recognize that there are

4    moments where those feelings need to be essentially considered

5    in conjunction with our governing law.

6            And our law here today is 3553(a), and that says, What

7    is an amount of time that is sufficient but not more than

8    necessary?  And I -- my position and Ms. Grace's position is

9    that 21 years accomplishes everything that needs to be

10   accomplished here; it delivers justice, it sends a message,

11   general and specific deterrence, it provides him with the

12   much-needed medical care that he will receive, it protects the

13   public, and it does all of that without being more than

14   necessary.  And so we request that sentence of 21 years.

15           I have some specific requests for placement.

16           THE COURT:  Okay.

17           MR. HURSON:  We would ask that the Court recommend

18   the -- obviously -- and I should take step back.  The language

19   that is in our revised plea agreement with respect to credit for

20   time spent in custody, I --

21           THE COURT:  Which paragraph is that?

22           MR. HURSON:  In the revised plea agreement, it is --

23           THE COURT:  In the amendments, right.

24           MR. HURSON:  I think it's in the first paragraph or

25   the -- I'm sorry, the second paragraph on the top of page 2.

1          We would ask that the Court include that language.  We

2    recognize that that is just a recommendation, however, and I try

3    to remember as little of the last time we were here as possible,

4    but it sounds like everyone is in agreement that that time will

5    be credited but that the Court has the authority to make that

6    recommendation.  And we have agreed to ask the Court to make

7    that recommendation, so we would ask that the judgment, whatever

8    sentence you impose, also include the language included in

9    paragraph 2, regarding --

10          THE COURT:  You mean the dates and so forth because,

11   I think you're agreeing to request that.

12          MR. HURSON:  That's right.

13          THE COURT:  Although I think you just said you agree

14   that it's not that the Court can give credit, the Court can only

15   recommend it to BOP.

16          MR. HURSON:  That's right, that's right.  I think

17   there --

18          THE COURT:  And -- for those time periods.  And that

19   represents the time in Irish custody, correct?

20          MR. HURSON:  Irish custody, and then beginning in the

21   United States -- it kind of -- it represents both, really; it

22   represents the Irish custody and then his continued custody

23   with -- in the -- with the U.S. Marshals.

24          As far as specific locations, the Court obviously is

25   familiar with requesting specific locations.  What we would ask

1    for is either FCI Petersburg or FCI Butner.  Obviously, it's up

2    to the BOP as to where they would send him, but those are the

3    two institutions that we have researched and would request that

4    Mr. Marques be designated to.

5            And as I noted, I would also ask if the Court could

6    recommend participation in a sex offender management program.

7    The acronym the BOP tends to use is SOMP.  We would ask for

8    that.

9            THE COURT:  And Petersburg and Butner, is that because

10   of particular programs?  Not geographic, correct?

11           MR. HURSON:  The geographic, you know, doesn't matter

12   as much as the programming does.

13           THE COURT:  Right, it doesn't.

14           MR. HURSON:  And the SOMP program is one that is

15   offered at those two places.  So that's something we're asking

16   for.

17           And I also note that Mr. Marques is at risk for

18   possible repercussions, not just because of what Dr. James talks

19   about, which is his inability -- and I'm being very frank, and

20   she's far more eloquent than I am, but his difficulties in

21   interacting with others puts him at risk, but so does this

22   charge.  And these are two facilities where people who have

23   similar charges often go, which doesn't provide 100 percent

24   certainty that there won't be a risk to his, you know, health

25   and safety, but it provides a little bit of hope that there will

1    not be recriminations for what he did.

2           Unlike a lot of defendants, Mr. Marques' case is in

3    the news, and people -- I don't know if Your Honor is aware, but

4    people very frequently call relatives to look up new detainees

5    who have been moved into a facility to find out what they did.

6    And I know it's no surprise to find out that people who come

7    with charges like Mr. Marques' are at risk of assault simply

8    because of the charges.

9           And we would also -- I don't want to wade too far into

10   it, but we're not opposed to the conditions that have been

11   suggested by Probation, but I agree with Your Honor that it is a

12   bit of an academic exercise, because he intends to leave as soon

13   as he possibly can.  And therefore, I don't know that it's

14   necessary, but given that it's an academic exercise to some

15   extent, we wouldn't be opposed to the inclusion of conditions.

16   But I don't know that it's necessary.

17          THE COURT:  Well, and you're -- are you in agreement

18   with me, at least, that these conditions do kick back in if he

19   decides to come back?

20          MR. HURSON:  Absolutely.  I think the conditions say

21   that within 72 hours, if he were to for some reason come back --

22   and I know I made this clear with respect to family visits, but

23   he has literally at this point no ties to the United States.

24          THE COURT:  Right.

25          MR. HURSON:  We have no custodians, no friends, no

1    family, nobody, no addresses.  So I don't intend for this to

2    happen, but if he were to return, I believe the conditions

3    require that within 72 hours, he notify the Probation Office in

4    the jurisdiction where he's returning to, and then that would

5    more than likely kick in all of these conditions.

6           THE COURT:  It does say -- and again, it's a little

7    tricky in terms of enforcement, but you would agree that it does

8    say he must adhere to all requirements governing registration of

9    sex offenders in Ireland.  And so that is a condition, so

10   for example, if he didn't do that, that would be a violation.

11          MR. HURSON:  I think it would.  It's tricky, because

12   I'm -- obviously -- we're trained to think in worst-case

13   scenarios.  I think -- I'm sorry -- he goes to Ireland and he's

14   not doing something, you know, he's not providing his financial

15   information to his Irish probation officer, I don't see a

16   scenario where the government could seek a warrant for his

17   arrest in the United States for a violation of supervision and

18   seek to somehow extract -- you know, extradite him or something

19   like that.

20          But there are permutations here that make me a little

21   bit nervous, but I think everyone's in agreement that once he

22   leaves the United States, he will not be under the supervision

23   of Probation, and therefore, there will not be any allegations

24   that he has violated his probation while on foreign soil.  The

25   Court wouldn't have the authority to do that.

1              THE COURT:  So can I ask two questions regarding this

2     condition?  I'm sorry to spend so much time on it --

3              MR. HURSON:  No, it's important.

4              THE COURT:  -- but I think it's an interesting and

5     important one.  First off, I don't believe the plea agreement,

6     either overall or as amended -- usually, for a C plea, the

7     agreement is on the term of imprisonment, and the conditions are

8     not subject to withdrawal of the guilty plea if they're not

9     exactly as the parties agree to.  Is that the case --

10             MR. HURSON:  That is right.  I believe that probably,

11    the language is in there, that conditions of supervision still

12    remain in the Court's purview.

13             THE COURT:  Okay.  So do you see any legal or

14    practical problem with a slight modification of the proposed

15    condition, at least that Probation has gleaned from the

16    plea agreement, rather than saying he shall be permitted to

17    depart from the United States and reside in Ireland immediately

18    upon the completion of any term of imprisonment, that it be

19    slightly different, where it would be, the defendant shall be

20    permitted to depart the United States to reside in Ireland upon

21    providing proof that he has registered or complied with

22    requirements in Ireland to registration of sex offenders.

23             MR. HURSON:  I do see a practical problem with that.

24    One, you cannot preregister; you have to arrive in Ireland, and

25    then you are obligated within seven days to go to the Gardaí and

1  register.  I would put it -- I do not want to sound like I'm

2  disparaging my city, but it would be as though someone called

3  from England to the Baltimore City Police Department and said,

4  I'd like to preregister.  I'm going to go out on a limb and tell

5  you what the response would be; We don't do that, you've got to

6  come here, and then you can register.  I do not see a problem

7  with the conditions, necessarily, as written.

8       I will say the process of relocation from BOP is one

9  that begins about six months or so, sometimes even a year before

10 you get out, and it requires the case manager to find a

11 residence and location for you.  There are some aspirational

12 goals there and then there's some practical goals.  And I have

13 gotten phone calls from people who have literally been dumped at

14 a homeless shelter to begin their supervision, and they have no

15 contacts whatsoever.

16      I would want to make sure that whatever the conditions

17 are, that it is clear that Mr. Marques can go to his case

18 manager and say, help me get back to Ireland, and the case

19 manager won't just say, Sorry, you've got to go to Baltimore and

20 then figure it out.  So whatever we could craft, I would

21 certainly be in favor of it, as long as it doesn't cause any

22 delay in that relocation.

23      THE COURT:  What if it was -- and you're right, I

24 mean, this is -- under either scenario, or any scenario, it's a

25 long ways into the future.  What if it wasn't that you need to

1  register, which you said may not be possible; what if it was,

2  you need to -- before you depart, you need to notify -- and

3  you-all could tell me what the right office is -- notify

4  whatever office in Ireland of your release and your arrival date

5  in Ireland, something like that?

6         MR. HURSON:  I think it would be the Gardaí, which is

7  the sort of national police force.  And I don't see a problem

8  with that, because I think that requires the notification.

9  That's something that Mr. Marques can do, and it doesn't

10  necessarily require the foreign government to do anything other

11  than answer the phone.  I think that's fine.  I'm just trying to

12  avoid situations where the government of Ireland is essentially

13  being obligated to something that it won't do.

14         THE COURT:  Well, right.  So what that would be is

15  that he's required to provide notification and perhaps receive

16  confirmation of receipt of the notification that, I'm out, and

17  I'm going home, and I'm going back.  And then, I guess, if they

18  choose to say, Well, we know where you are, so we'll follow up

19  with you if you don't register -- which is a requirement

20  anyways, but it's sort of unenforceable once he gets there.

21         MR. HURSON:  Yes.

22         THE COURT:  Or they choose to do nothing with it, I

23  guess you're right, that's sort of a different sovereign, so

24  they can decide that, but at least they've been put on notice.

25         MR. HURSON:  I think that's fair.  If he's -- the

1 requirement is that he put the Irish government on notice that

2 he intends to return home, I'll send that letter myself.  Quite

3 frankly, I could do it this afternoon.  I don't -- that might be

4 a little early, but --

5            THE COURT:  That's a little early.

6            MR. HURSON:  But I do think that we could agree to

7 that.

8            THE COURT:  Okay.

9            Okay, so keep going; anything you --

10            MR. HURSON:  That's basically all we have for specific

11 recommendations.  I would love it to ask the Court, you know,

12 for some counseling program that addresses ASD, but they don't

13 have one -- I've done tons of research into that, so we'll just

14 have to rely on the basic programming.

15            But you know, I close again by saying that there is

16 no one in this courtroom who is not repulsed by what happened in

17 this case, and I don't want anything I say to take away from

18 that fact.  And Mr. Marques will allocate himself, and I'll tell

19 you that his affect and his demeanor is exactly as described by

20 Dr. James.  So it may not come across, but in my many, many,

21 many, many hours of spending time with Mr. Marques, I can tell

22 you without equivocation, he understands that this behavior is

23 wrong.  And I recognize the government's talking about him doing

24 it again, and that's not the man that I've spent time with.  He

25 will not do this again, and he is remorseful for what he's done.

```
 1    And we request a sentence of 21 years.
 2              THE COURT:  Thank you.
 3              Mr. Marques, now is the opportunity, if you would
 4    like, to make a statement before the sentence is issued.  I'd
 5    ask you to stand up and hold the microphone vertically so it's
 6    as close to you as possible.
 7              THE DEFENDANT:  Your Honor, thank you for giving me
 8    the opportunity to speak.
 9              Your Honor, thank you for the opportunity to speak.
10    I'm very sorry to the victims.  I beg for mercy from the Court.
11    I realize now that what I did was very wrong, that children were
12    harmed in the making of the images and videos that appeared on
13    Freedom Hosting and that my actions contributed to this harm.
14              I never really understood Asperger's or autism
15    spectrum disorder until I read part of Dr. James' report.
16    Reading Dr. James' words helped me understand myself in a way
17    that I never understood myself before.  If given the
18    opportunity, I would like to make use of the treatment options
19    set forth by Dr. James.
20              During the time I've spent in jail, I've learned my
21    lesson, and I certainly will never get involved in anything like
22    this again.  I have destroyed my reputation and my family's
23    reputation.  Please give me a second chance.
24              THE COURT:  Thank you.
25              THE DEFENDANT:  Thank you.
```

1          THE COURT:  If you could just give me a moment.

2          (Conference at the Bench.)

3      It is the policy of this Court that every guilty plea and

4  sentencing proceeding include a bench conference concerning

5  whether the defendant is or is not cooperating.

6          (Open court.)

7          THE COURT:  In considering the appropriate sentence

8  for Mr. Marques, I've considered the advisory guideline range,

9  which is 324 to 360 months, and the plea agreement's joint

10  recommendation for a sentence between 252 and 324 months, as

11  amended.  I have also considered all the factors in 18 U.S.C.

12  3553(a), including the nature and circumstances of the offense,

13  the history and characteristics of the defendant, the need to

14  meet the purposes of sentencing, and the need to avoid

15  unwarranted disparities among similar defendants, and I will

16  discuss some but not all of those factors in detail.  And I have

17  also considered Congress' direction that the sentence imposed be

18  sufficient but not greater than necessary to meet the purposes

19  of sentencing.

20          On the nature of the offense, the defendant created a

21  hosting service on the dark web that was used to host and allow

22  the distribution of hard-core child pornography of the most vile

23  kind, including the rape and torture of children.  Not only did

24  the defendant's Freedom Hosting service facilitate the regular

25  transfer of millions of images of child pornography, it actively

1    solicited the creation of new child pornography by requiring, as

2    a condition of membership for certain sites the distribution of

3    new child pornography.

4            Unlike other child pornography cases, Mr. Marques was

5    not just someone who liked to view child pornography and as part

6    of that ended up transferring images; he was responsible for the

7    electronic platform that allowed for mass distribution around

8    the world.

9            In drug cases, we often see as defendants street-level

10   or mid-level drug dealers and sometimes question whether we are

11   solving the problem or at least addressing the problem by

12   focusing on those lower-level individuals.  But the reality is,

13   it's rare and difficult for law enforcement to track down and

14   bring to justice the drug kingpin.  And so the reality is that

15   that doesn't happen quite -- very often.

16           Similarly, in child pornography cases, we do see users

17   of child pornography, low-level distributors, sometimes

18   producers of it.  But given the nature of the internet, the dark

19   web and just the nature of cyber crimes generally and the

20   difficulty of identifying who's responsible for what is

21   appearing on the internet, the fact that they may be in multiple

22   jurisdictions, the evidence may be kept in an unknown location

23   that's outside the reach of domestic law enforcement, it is

24   very, very difficult to identify and bring to justice someone

25   who effectively is the equivalent of a drug kingpin, someone who

1    has control over the supply of the contraband, or the illegal

2    material, and the ability to make -- have it transferred and

3    distributed around the world.

4           So while this Court has at times considered and given

5    downward variances, including very significant downward

6    variances for child pornography defendants, in light of the

7    generally high level of the guidelines and what some would say

8    are excessively high levels in general for at least certain

9    forms of this offense, this case is different.  Based on the

10   heinous nature of the crime and Mr. Marques' central role, a

11   guideline sentence would certainly be warranted for this type of

12   offense, even if downward variances are granted in other cases.

13   And given the nature of this offense, it's not even necessarily

14   the case that a low-end sentence is the appropriate sentence

15   within the guideline range.

16          Although there is no evidence that the defendant

17   physically abused any children or personally produced the

18   pornography, his receipt and distribution of the child

19   pornography not only helped to create a market for others to

20   generate child pornography, but it also perpetuated the

21   psychological harm to victims who must live with the knowledge

22   that even many years after their abuse, their images remain in

23   circulation so that their victimization does not end.

24          Through the victim impact statements and the

25   restitution materials that were submitted, it's clear that this

1    crime has had and continues to have that exact impact on many

2    children and continues to have that impact even now that some of

3    those children are not just adults but middle-aged adults,

4    decades past the actual creation of the child pornography.

5         A significant sentence is therefore needed to deter

6    others from engaging in this crime, to recognize the seriousness

7    of this offense, to provide just punishment, given, in

8    particular, the severe impact it has on victims.  And as I said,

9    a severe sentence isn't necessarily even a low-end sentence.

10        On the history and characteristics of the defendant,

11   Mr. Marques has no criminal record.  And the primary fact

12   offered in his defense is that he has Asperger's syndrome or is

13   on the autism spectrum, which the defense has argued in various

14   ways, made it difficult for him to fit in socially and to a

15   certain extent has some ability to explain his conduct here, and

16   that ties it to a disorder rather than simply criminal intent.

17        The Court agrees that the Asperger's syndrome has some

18   role in the defendant's criminal conduct and is a mitigating

19   factor.  Arguably, the defendant's mental health issues caused

20   him to lack the ability to form social relationships in the same

21   ways as others, and it may have led him down this path.  He also

22   may not have had as full an appreciation of the harm caused by

23   the crime as others might.

24        At the same time, it is certainly not an excuse or

25   even a grounds for a significant downward variance in this case.

1    The Court, in particular, notes that the defendant, once caught

2    and released, took the conscious step of locking out the police

3    from his server, thereby obstructing justice.  He tried to do it

4    again -- well, he did it when he was arrested and also after he

5    was released.

6            As the government has noted, he stored these materials

7    in the dark web on -- in a separate place from his legitimate

8    hosting services, so he was fully aware of the difference and of

9    the illicit nature of this material.  So it illustrates that he

10   is not someone whose mental health issues were so severe that he

11   did not understand what he was doing to be criminal and wrong.

12   And so although it is a mitigating factor, I don't find it to be

13   one that -- it has some -- it has a limited impact on the

14   sentence.

15           The defendant argues for a variance based on other

16   factors, including the lengthy and difficult pretrial conditions

17   in a foreign country and during the COVID-19 pandemic.  The

18   distance from home is not a particularly persuasive factor.

19   Many federal defendants end up incarcerated very far from home.

20   Here, the crime had a worldwide reach, so Mr. Marques should

21   certainly not have been surprised that he could have ended up in

22   an American prison.

23           The Court does agree that the conditions during

24   COVID-19 are mitigating and that there have been COVID-19

25   outbreaks in jails and at prisons, including those at which our

1   pre-trial detainees in this district have been held, and the

2   conditions have been more restrictive for public health reasons

3   and have imposed a greater hardship on defendants in typical, so

4   that is also mitigating factor.

5          Ultimately, the Court will accept a revised plea

6   agreement range of 252 to 324 months, but I do find -- and

7   although the defense has asked, effectively, for a six-year

8   downward variance, I don't find that to be appropriate in this

9   case.

10          I'm conscious of the argument the defense has made

11   that given the heinous nature of the crimes, there's a risk that

12   emotion and passions will cause the Court to impose an

13   unreasonably high sentence, that even if society wants that,

14   that there is -- it is important for the law and the justice

15   system to restrain itself from such -- from matching, perhaps,

16   the public outrage over certain types of crimes.  But here,

17   we -- and I'm also conscious of the fact that 3553(a) requires

18   the Court to consider more than just the guidelines.

19          But I also note that when we have a guidelines system,

20   which is the starting point for a sentence, and when the

21   government's recommendation is the low end of that guideline

22   range, I don't believe that such a sentence is one that reflects

23   irrational emotion or plays into the fears of the public more

24   than looking at it within the confines of the law.  Perhaps, if

25   there was an effort to impose a significant upward variance,

1    that might be a better concern, or a more significant concern,

2    but I think, given the government's recommendation in the

3    plea agreement, that a low-end sentence does not fall victim to

4    those concerns.

5         In the end, I do believe that although there are these

6    mitigating factors, as I said, the Asperger's syndrome, the

7    COVID-19 pandemic, those mitigating factors serve to justify a

8    low-end sentence within the guideline range, as opposed to a

9    mid- or high-range sentence in the guideline range.  And so

10   although those concerns were taken into account, I don't believe

11   they warrant a downward variance in this case.

12        Ultimately, I conclude that the nature and

13   circumstances of this offense are such that this sentence is

14   necessary to reflect the seriousness of the offense, to promote

15   respect for the law, and to provide just punishment.  It's also

16   needed to protect the public from further crimes by the

17   defendant, particularly where this is the kind of crime that can

18   be conducted from anywhere, at any age, just with the access to

19   technology.  There's also need to protect the public from

20   further crimes and to deter him and others who would be inclined

21   to facilitate the distribution of child pornography on such a

22   large scale.

23        Even those in other countries, as well as across the

24   United States, must know that if they think they can profit or

25   benefit from this kind of activity, they could face very severe

1    consequences through the American justice system.  And I think,

2    as I said earlier, given how easy it is to avoid detection and

3    law enforcement for any kind of internet crime, but certainly

4    this type of crime, there may be perhaps a sense that

5    individuals can engage in this criminal activity and either not

6    get caught or that the ability to bring people to justice is so

7    difficult that it won't happen in their cases.

8           And so a below-guideline sentence with a downward

9    variance I think sends the wrong message, that this is not as

10   serious an offense as could be -- as it actually is and that in

11   order to have the kind of general deterrence that we need,

12   particularly given the difficulty bringing these types of cases

13   to justice, that at a minimum, a low-end sentence is necessary

14   to meet that important purpose of sentencing, particularly in

15   these types of cases where, frankly, the deterrence, to the

16   extent there is any, is certainly one of the few tools

17   available, particularly for these criminals who are perpetrating

18   this came around the world and in different corners of the

19   world.

20          I will recommend to the Bureau of Prisons that the

21   defendant receive credit for the time spent in Irish custody as

22   well as his pretrial detention here, because as stated at the

23   last hearing, if that time was not credited to another sentence,

24   which I think the evidence at this point appears to be that it

25   was not, he would be entitled to credit, even though it was in a

1  foreign justice system, under cases such as Major v. Apker, 576

2  F. App'x 284 (4th Cir. 2014).

3         On the issue of supervised release, there is this

4  mandatory minimum term of five years of supervised release, and

5  the government has recommended lifetime supervised release.  On

6  the one hand, that is not unusual in these types of cases.  I

7  agree with the government that the type of crime at issue here

8  could be perpetrated at any time and at any age.

9         I would have some concerns, perhaps, of imposing the

10  lifetime supervised release, given the somewhat intrusive

11  conditions that are set forth in the recommended conditions of

12  supervised release, but I think, on balance, where the reality

13  is, as discussed in the hearing today, most of these conditions

14  will not directly apply, so the main purpose of supervised

15  release is just to make it clear that if Mr. Marques returns, it

16  will be this set of conditions that will apply.

17         I don't find a lifetime supervision period to be

18  overly draconian, and I do think that there is some value in the

19  understanding that, particularly if there has been no

20  supervision initially, if he were for some reason to return in

21  the future, that there would be the ability to get him back onto

22  the radar of the justice system and have the monitoring here,

23  particularly the computer usage, et cetera.

24         So I will agree that although it is a significant

25  sanction in most cases, under these circumstances and given the

1     nature of the crime and the ability for it to be perpetrated

2     pretty much anywhere at any time and even far into the future, I

3     will agree with the lifetime supervision.  However, I will also

4     agree with the proposed recommendation that the defendant be

5     permitted to depart the United States.  I'm not sure, again, the

6     lack of supervision is what I would have in mind, but I do agree

7     that as a practical matter, if he has no place to live here in

8     the United States, that that is likely where he could only

9     practically live.

10          I will include a modification to the conditions along

11    the lines of what I said earlier, where he won't be permitted to

12    leave the United States and go to Ireland to reside unless or

13    until he can provide proof that he has notified the Gardaí, or

14    the Irish national police, of his departure, of the

15    circumstances of his conviction and sentence, and has

16    received -- and that Probation has received confirmation that

17    they have received that notification.

18          So that to the extent there is this requirement of

19    registration with Irish authorities for sex offen- --

20    registration for sex offenders with Irish authorities, that he

21    is not someone who will fall off the radar over there, that they

22    will be aware of him, particularly since the news on this case

23    will probably have dissipated significantly by the time that

24    point arrives.

25          And so I will make that modification, which I don't

1    think, again, intrudes on Irish sovereignty or also creates any

2    significant barrier to Mr. Marques returning, but I think it

3    allows us to feel comfortable at least that to the extent the

4    Irish authorities have some ability or interest in supervising,

5    that they will do so.

6          Finally, on the issue of restitution, the parties have

7    agreed on this amount of $87,000.  I know that restitution in

8    these cases is difficult, so the fact there's an agreement makes

9    it easier.  This case more than others I think warrants

10   restitution.  There's sometimes a fair debate whether an

11   individual user should be held financially responsible to a

12   highly significant degree for individual pictures.  I don't

13   think there's any question in this case, given the global impact

14   of Mr. Marques' activities, that he is -- that it is appropriate

15   to have this level of restitution.  If more had been

16   established, that might have been appropriate, too, but given

17   what's been proven and established here, this amount will be

18   included in the restitution order.

19          And as I said earlier, I will enter the order of

20   forfeiture and make it part of the judgment, and I will request

21   both that the amount of restitution -- or that $87,000 of the

22   forfeited amount be directed to restitution.  I'll ask for a

23   follow-up report on whether that has happened or not.

24          I believe that leads me to impose the sentence itself.

25   Mr. Marques, if you could stand, please.

1            THE DEFENDANT:   (Complying.)

2            THE COURT:   In the case of United States v. Marques,

3    the Court sentences the defendant as follows:   On Count One,

4    conspiracy to advertise child pornography, the Court sentences

5    you to a term of imprisonment of 324 months, to be followed by

6    lifetime supervised release.   In addition to the standard and

7    statutory conditions of supervised release which are set forth

8    in the presentence report, I will impose the following special

9    conditions of supervised release, and there are many, here.

10           First, the defendant shall be permitted to depart the

11   United States to reside in Ireland upon completion of his term

12   of imprisonment.   The defendant will not be permitted to do so

13   until he has provided proof of notification to the Irish

14   national police, the Gardaí, of his conviction, his sentence,

15   and his return -- his plan to return to Ireland, and that the

16   Probation Office has received written confirmation from the

17   Irish authorities that they have received that notification.

18           The defendant must adhere to all requirements

19   governing the registration of sex offenders in Ireland,

20   including registration with Irish authorities and any required

21   monitoring.   If he does end up, under these circumstances,

22   departing the United States, the term of his supervision shall

23   be non-reporting -- a non-reporting term of supervised release.

24           If the defendant reenters the United States during the

25   term of supervised release, he shall report, in person, within

1   72 hours to the nearest U.S. Probation Office.  In addition, he

2   must submit his computers or other electronic communications or

3   data storage devices or media to a search.

4           You must not access the internet except for reasons

5   approved in advance by the probation officer.  You must allow

6   the probation officer to install computer monitoring software on

7   any computer.  To ensure compliance with the computer monitoring

8   conditions, you must allow the probation officer to conduct

9   initial and periodic unannounced searches of any computers

10  subject to computer monitoring.

11          Those searches shall be conducted for the purposes of

12  determining whether the computer contains any prohibited data

13  prior to installation of the monitoring software, to determine

14  whether the monitoring software is functioning effectively after

15  its installation, and to determine whether there have been any

16  attempts to circumvent the monitoring software after its

17  installation.

18          You must warn any other people who use these computers

19  that the computers may be subject to search pursuant to these

20  conditions.  You must warn any other people who use these

21  computers or devices capable of accessing the internet that they

22  may be subject to search pursuant to these conditions.

23          The probation officer may conduct a search pursuant to

24  the condition -- this condition only when there's reasonable

25  suspicion that there's a violation of a condition of supervised

1    release and that the computer device contains evidence of this

2    violation.  Any search will be conducted at a reasonable time

3    and in a reasonable manner.

4            You must pay the outstanding monetary restitution at a

5    rate of $100 per month, beginning 30 days after release.  You

6    must pay the special assessment of $100.  You must provide the

7    probation officer with access to any requested financial

8    information and authorize the release of that financial

9    information, which may be provided to the U.S. Attorney's

10   Office.

11           You may not rent or use a post office box or storage

12   facility without the prior approval of the probation officer.

13   If approved, any changes must be reported 72 hours in advance,

14   and you must permit the probation officer to conduct random

15   inspections of any approved storage facility.

16           You must not have direct contact with any child

17   you know or reasonably should know to be under the age of 18,

18   not including your own children, without the permission of the

19   probation officer.  If you do have any direct contact with any

20   such child without the permission of a probation officer, you

21   must report that contact within 24 hours to the probation

22   officer.  Direct contact includes written communications,

23   in-person communications, or physical contact.  It does not

24   include incidental contact during ordinary daily activities in

25   public places.

1          You must not go to or remain at any place where you

2     know children under the age of 18 are likely to be, including

3     parks, schools, playgrounds, and childcare facilities.  You must

4     not go to or remain at any place for the primary purpose of

5     observing or contacting children under the age of 18.

6          You must not view or posses any visual depiction,

7     including a photograph, film, video, picture, or

8     computer-generated image or picture, whether made or produced by

9     electronic, mechanical, or other means of a sexually explicit

10    conduct.  You must not view or possess any visual depiction,

11    including any photograph, film, video, picture, or computer, or

12    computer-generated image or picture, whether made or produced by

13    electronic, mechanical, or other means of sexually explicit

14    conduct that would compromise your sex offense specific

15    treatment.

16         You must participate in a sex offense specific

17    assessment, and you must participate in a sex offense specific

18    treatment program and follow the rules and regulations of that

19    program.  The probation officer will supervise your

20    participation in that program.  You must submit to periodic

21    polygraph testing at the discretion of the probation officer as

22    a means to ensure that you are in compliance with the

23    requirements of your supervision or treatment program.

24         You must participate in a mental health treatment

25    program and follow the rules and regulations of that program,

```
 1    and the probation officer, in consultation with the treatment

 2    provider, will supervise your participation in the program.

 3             You must comply with the sex offender registration

 4    requirements of the Sex Offender Registration and Notification

 5    Act.

 6             I believe that completes the additional terms of

 7    supervised release.  Mr. Hurson, is there -- will you waive the

 8    reading of the standard and statutory conditions which are in

 9    the presentence report?

10             MR. HURSON:  Yes, and we've covered those.  I did have

11    one minor modification request.  The provision that we -- you

12    came up with, with regard to notifying Irish authorities, I

13    believe you read it as confirmation by Probation, and I was

14    wondering if you would consider having confirmation by the

15    Bureau of Prisons, because he would begin his process of sort of

16    preparing to return home with his case manager, in which case,

17    his case manager could contact the Gardaí and they could affirm

18    that contact and that -- because if it's probation, he would

19    have to finish --

20             THE COURT:  Okay.

21             MR. HURSON:  -- and walk out the door and then report

22    to an office and --

23             THE COURT:  I understand.  Why don't we say the Bureau

24    of Prisons or Probation.

25             MR. HURSON:  That's perfect.
```

1    THE COURT:  If he somehow ends up outside, it would be

2    Probation at that point.

3    MR. HURSON:  That's perfect.  And I would say

4    confirmation, because they might use e-mail.  I think it might

5    have said written.  I just want to make sure; I've had too many

6    VOSRs.  But I think just confirmation would be sufficient.

7    THE COURT:  Okay.  We can do that, even though,

8    arguably, e-mail is written, at least I view it as such.

9    Okay.  So in addition to that, the sentence will

10   include an order of restitution of $87,000 to be distributed to

11   the victims listed in the government's submission.  I will

12   approve the proposed order of forfeiture and make it part of the

13   judgment, with the first 87,000 or with a recommendation that

14   the first 87,000 be transferred to the -- by the government to

15   the Court to apply to restitution.  I will impose no fine, as

16   any funds should go towards that restitution.  You are required

17   to pay the special assessment of $100.

18   And that concludes the terms of the judgment.  I will

19   separately issue a -- just a freestanding order asking --

20   ordering the government to provide a report on the transfer of

21   the funds, 30 days after judgment.

22   With that, Mr. Marques, I think everyone here has

23   agreed, and I certainly do, that this crime was truly

24   despicable.  You set up a server that allowed for the worldwide

25   trade in the most vile child pornography and also thus helped to

1   create a market that encouraged large numbers of children to be

2   sexually exploited and degraded with tremendous harm to them

3   that will last a lifetime.  You are effectively the child

4   pornography equivalent of a drug kingpin in your place in that

5   whole criminal world.  And it's a good thing for the world, and

6   all children and their families, that you will be behind bars

7   for a very long time.

8            I know that you have certain mental health issues, and

9   certainly, we hope that you can get those addressed during your

10  sentence so that after you serve it, you will be able to stay

11  away from this type of activity.  If you do go back to this kind

12  of activity, the next sentence would likely put you in prison

13  for the rest of your life, so you should think long and hard

14  before you go back to this type of activity.

15           At the same time, I understand and accept your

16  statement that you are remorseful about this now, that you did

17  not appreciate the impact.  I hope that in this process, you

18  have seen or will read some of these the statements from the

19  victims in this case.  It is heartbreaking to see what has

20  happened to these individuals.

21           Certainly, once you complete this lengthy sentence,

22  you will have paid your debt to society in one sense, but I

23  would certainly hope that you would take to heart that the pain

24  is going to continue and -- for many of the victims and that you

25  will try in some ways to make amends through whatever community

 1    service or other means that you can in the future.

 2            And with that, I will tell you that you generally have

 3    the right to appeal your conviction and sentence subject to any

 4    waivers you may have made in the plea agreement.  If there is a

 5    basis to appeal and you wish to do so, you must file a notice of

 6    appeal within 14 days of the entry of judgment.  If you request,

 7    the clerk will prepare and file a notice of appeal on your

 8    behalf.  And if you cannot afford to pay the cost of an appeal

 9    or for appellate counsel, you can apply to have the Court waive

10    the filing fee and appoint counsel to represent you on the

11    appeal.

12            With that, you may be seated.

13            Mr. Sullivan -- well, first of all, I will -- well, I

14    believe there are counts, Counts Two through Four, I believe,

15    that need to be moved for dismissal?

16            MR. SULLIVAN:  That's correct.  The government moves

17    to dismiss those counts at this time.

18            THE COURT:  Okay.  The Court will grant that motion,

19    and I will formally accept the plea agreement on those -- the

20    terms about dismissing counts as well.

21            Is there anything else that we should discuss today?

22            MR. SULLIVAN:  Not from the government, Your Honor.

23    Thank you.

24            MR. HURSON:  Your Honor, I don't know if you had

25    mentioned the recommendation for Butner and/or --

1            THE COURT:  Oh, I did not, okay.  So --

2            MR. HURSON:  I wanted to make sure that was in there.

3            THE COURT:  -- we will include in the judgment -- I

4    will include in the judgment recommendations to the Bureau of

5    Prisons for three things:  One is that they get -- that the

6    defendant receive credit for time served in Irish custody in

7    pretrial detention, which consists of -- let me just make sure I

8    have the dates.

9            I believe it's -- well, the presentence report has --

10    I just want to make sure those are the same dates as were in the

11    revised plea agreement.

12            Hold on one second; I'm just trying to make sure I've

13    got the right paper here.

14            July 29, 2013, July 30, 2013, and August 1, 2013 to

15    the present, that I will recommend that the Bureau of Prisons

16    grant him credit for that time.  I'll also recommend that he

17    serve his sentence at FCI Petersburg or Butner, to be in places

18    with the particular programs requested and also that he receive

19    the -- or that he be enrolled in the -- I'm sorry, I think I

20    keep getting the wrong documents here -- sex offender management

21    program, also known as SOMP.  Those are the three

22    recommendations, I believe.  Is there anything else?

23            MR. HURSON:  No, Your Honor.  Thank you.

24            THE COURT:  Okay.  Well, thank you all very much.  And

25    I want to thank counsel on both sides.  I know this has been a

1    complicated case, perhaps going back long before I got involved

2    in it, and so thank you all very much for your service on this

3    case.    Thank you.

4            THE COURTROOM DEPUTY:  All rise.  This Honorable Court

5    now stands adjourned.

6        (The proceedings were adjourned at 3:57 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2          I, Patricia Klepp, Registered Merit Reporter, in and for

3    the United States District Court for the District of Maryland,

4    do hereby certify, pursuant to 28 U.S.C. § 753, that the

5    foregoing is a true and correct transcript of the

6    stenographically-reported proceedings held in the above-entitled

7    matter and the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9                          Dated this 27th day of July, 2023.

10

11                    _____/s/_____

12                    PATRICIA KLEPP, RMR
                      Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25